Alan B. MALNAK, and Edwina K. Malnak, Harry C. Boone and Evelyn M. Boone, Harry C. Boone and Evelyn M. Boone, as guardians ad litem for their infant son David, William E. Gury and Margaret M. Gury, William E. Gury and Margaret M. Gury, as guardians ad litem for their infant daughter Laura Jean, Joseph G. Lerner, Joseph M. Duffy, Rev. Dr. Samuel A. Jeanes, Americans United For Separation of Church and State, a Non-Profit Corporation, Spiritual Counterfeit Project, Inc., a Non-Profit Corporation, Coalition For Religious Integrity, an Unincorporated Association

v.

Maharishi Mahesh YOGI, Spiritual Regeneration Movement Foundation, World Plan Executive Council—United States American Foundation For Creative Intelligence, Maharishi International University, Charles F. Lutes, Jerome W. Jarvis, Robert B. Kory, Janet Aaron, Board of Education of Maplewood—South Orange, New Jersey School District, Board of Education of Glen Ridge, New Jersey School District, Board of Education of West New York, New Jersey School District, Board of Education of Union City, New Jersey School District, New Jersey State Department of Education, New Jersey State Board of Education, Fred G. Burke, as New Jersey Commissioner of Education, Charles Wilson, State of New Jersey, United States Department of Health, Education and Welfare, and United States of America, David Mathews, Secretary of the United States Department of Health, Education, and Welfare.

Appeal of WORLD PLAN EXECUTIVE COUNCIL—United States, Jerome W. Jarvis, Robert B. Kory, and Janet Aaron.

Nos. 78–1568, 78–1882.

United States Court of Appeals, Third Circuit.

Argued Dec. 11, 1978.

Decided Feb. 2, 1979.

Steven M. Druker, Fairfield, Iowa, Peter R. Sterling, Morristown, N. J., for appellants, McCarter & English, Newark, N. J., of counsel.

Julius B. Poppinga, on brief, Geoffrey M. Johnson, Newark, N. J., for appellees.

Before ALDISERT, ADAMS and HUNTER, Circuit Judges.

OPINION OF THE COURT

PER CURIAM.

This appeal requires us to decide whether the district court erred in determining that the teaching of a course called the Science of Creative Intelligence—Transcendental Meditation (SCI/TM) in the New Jersey public high schools, under the circumstances presented in the record, constituted an es-

tablishment of religion in violation of the first amendment of the United States Constitution. Plaintiffs sought injunctive and declaratory relief and, after defendants had filed numerous depositions, answers to interrogatories, admissions, and other affidavits, the district court granted summary judgment in favor of plaintiffs. The court held that SCI/TM was religious activity for purposes of the establishment clause and that the teaching of SCI/TM in public schools is prohibited by the first amendment. The World Plan Executive Council—United States and certain individual defendants have appealed. We affirm, essentially for the reasons set forth by Judge H. Curtis Meanor in *Malnak v. Yogi*, 440 F.Supp. 1284 (D.N.J.1977).

The course under examination here was offered as an elective at five high schools during the 1975–76 academic year and was taught four or five days a week by teachers specially trained by the World Plan Executive Council—United States, an organization whose objective is to disseminate the teachings of SCI/TM throughout the United States. The textbook used was developed by Maharishi Mahesh Yogi, the founder of the Science of Creative Intelligence.

It teaches that "pure creative intelligence" is the basis of life, and that through the process of Transcendental Meditation students can perceive the full potential of their lives.[1]

Essential to the practice of Transcendental Meditation is the "mantra"; a mantra is the sound aid used while meditating. Each meditator has his own personal mantra which is never to be revealed to any other person. It is by concentrating on the mantra that one receives the beneficial effects said to result from Transcendental Meditation.

To acquire his mantra, a meditator must attend a ceremony called a "puja." Every student who participated in the SCI/TM course was required to attend a puja as part of the course. A puja was performed by the teacher for each student individually; it was conducted off school premises on a Sunday; and the student was required to bring some fruit, flowers and a white handkerchief. During the puja the student stood or sat in front of a table while the teacher sang a chant and made offerings to a deified "Guru Dev." Each puja lasted between one and two hours.[2]

---

1. For a detailed discussion of the textbook used in the course, see *Malnak v. Yogi*, 440 F.Supp. at 1289–1305.

2. For a comprehensive description of the puja, see 440 F.Supp. at 1305–08. The district court described the activities of a chanter at the puja ceremony:

> The chanter . . . makes fifteen offerings to Guru Dev and fourteen obeisances to Guru Dev. The chant then describes Guru Dev as a personification of "kindness" and of "the creative impulse of cosmic life," and the personification of "the essence of creation,"
> . . . . .
> The chanter then makes three more offerings to Guru Dev and three additional obeisances to Guru Dev. The chant then moves to a passage in which a string of divine epithets are applied to Guru Dev. Guru Dev is called "The Unbounded," "the omnipresent in all creation," "bliss of the Absolute," "transcendental joy," "the Self-Sufficient," "the embodiment of pure knowledge which is

beyond and above the universe like the sky," "the One," "the Eternal," "the Pure," "the Immovable," "the Witness of all intellects, whose status transcends thought," "the Transcendent along with the three gunas," and "the true preceptor." Manifestly, no one would apply all these epithets to a human being.

440 F.Supp. at 1308 (footnote omitted).
The district court concluded:

> [T]he puja is sung at the direction of Maharishi Mahesh Yogi, a Hindu monk. The words and offerings of the chant invoke the deified teacher, who also was a Hindu monk, of Maharishi Mahesh Yogi. In the chant, this teacher is linked to names known as Hindu deities. Maharishi Mahesh Yogi places such great emphasis on the singing of this chant prior to the imparting of a mantra to each individual student that no mantras are given except at pujas and no one is allowed to teach the Science of Creative Intelligence/Transcendental Meditation unless he or she performed the puja to the personal

The district court found that the SCI/TM course constituted a religious activity under the first amendment. In its exhaustive and well-reasoned opinion, the court concluded its analysis by stating:

When courts are faced with . . . forms of "religion" unknown in prior decisional law, they must look to the prior interpretations of the constitutional provisions for guidance as to the substantive characteristics of theories or practices which have been found to constitute "religion" under the first amendment. The Supreme Court has interpreted the religion clauses of the first amendment several times in its recent history. *E. g., Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1963); *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The historical development and purpose of the religion clauses have been elaborated in a number of these cases, especially in *Engel* and in *Everson*. Religion, as comprehended by the first amendment now includes mere affirmation of belief in a supreme being, *Torcaso, supra*, invocation of a supreme being in a public school, *Engel, supra*, and reading verses from the Bible without comment, *Schempp, supra.*

Defendants argue that all of the above-discussed decisions are inapposite to the issues in this suit because the activity in question in each of the prior cases was represented or conceded to be religious in nature whereas defendants in the instant action assert that the activities are not religious in nature. The court notes the distinction but cannot accept defendants' conclusion that the decisions are not relevant. The cases, at the very least, reveal the types of activity and belief that have been considered religious under the first amendment.

*Malnak v. Yogi*, 440 F.Supp. at 1315.

We agree with the district court's finding that the SCI/TM course was religious in nature. Careful examination of the textbook, the expert testimony elicited, and the uncontested facts concerning the puja convince us that religious activity was involved and that there was no reversible error in the district court's determination.

A recognition of the religious nature of the teachings and activities questioned here is largely determinative of this appeal because of the apparent governmental action which is involved. Under the most recent Supreme Court pronouncement in this area, *Committee for Public Education v. Nyquist*, 413 U.S. 756, 773, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Court reiterated the three criteria within which to scrutinize the involved governmental action. To pass muster, the action in question must: (1) reflect a clearly secular legislative purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion. The district court applied the *Nyquist* test and determined that the SCI/TM course has a primary effect of advancing religion and religious concepts, *School District of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), and that the government aid given to teach the course and the use of public school facilities constituted excessive governmental entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

satisfaction of Maharishi Mahesh Yogi or one of his aides. . . . Needless to say, neither Hinduism nor belief in "the Lord" constitute a dead religion. Both of these beliefs are held by hundreds of millions of people. 440 F.Supp. at 1311–12.

Appellants urge that even if the SCI/TM course and the puja are clearly religious, the district court erred in applying the controlling legal precept because the religious effect of the course and the puja was not significant. In advancing this argument, appellants rely on *Grossberg v. Deusebio*, 380 F.Supp. 285 (E.D.Va.1974); *Wood v. Mt. Lebanon Township School District*, 342 F.Supp. 1293 (W.D.Pa.1972); and *Wiest v. Mt. Lebanon School District*, 457 Pa. 166, 320 A.2d 362 (1974), for the proposition that religious effect must be substantial in order to be unconstitutional. *Grossberg, Wood*, and *Wiest* upheld as constitutional the delivery of invocations and benedictions at high school graduation ceremonies.[3] We are not persuaded that the reasoning employed in those cases requires reversal in this case because of the factual differences between a benediction at a non-instructional high school commencement exercise open to the public and the teaching of SCI/TM which includes ceremonial student offerings to deities as part of a regularly scheduled course in the schools' educational programs.

The judgment of the district court will be affirmed.

ADAMS, Circuit Judge, concurring in the result.

I concur in the judgment of the Court that the teaching of a course in the Science of Creative Intelligence, which was offered as an elective in certain New Jersey public schools, and was funded, in part, by a grant from a federal agency, constitutes an establishment of religion proscribed by the first amendment. In contrast to the majority, however, I am convinced that this appeal presents a novel and important question that may not be disposed of simply on the basis of past precedent. Rather, as I see it, the result reached today is largely based upon a newer, more expansive reading of "religion" that has been developed in the last two decades in the context of free exercise and selective service cases but not, until today, applied by an appellate court to invalidate a government program under the establishment clause. Moreover, this is the first appellate court decision, to my knowledge, that has concluded that a set of ideas constitutes a religion over the objection and protestations of secularity by those espousing those ideas. Under these circumstances, and recalling Justice Frankfurter's admonition that an individual expression of opinion is useful when the way a result is reached may be important to results hereafter to be reached,[1] I am impelled to state my views separately.

I—EXISTING PRECEDENT

The district court, while conceding that the decisions of the Supreme Court have avoided the creation of explicit criteria in determining what is a religion under the first amendment,[2] nonetheless bases its result on those very decisions:

The [district] court finds it unnecessary to improvise an unprecedented definition of religion under the first amendment because it appears that this case is governed by the teachings of prior Supreme Court decisions. Careful inspection of the facts in this suit reveal that the novel

---

**3.** In *Wood* the district court's holding was technically based on a determination that the defendant school board was not a proper person to provide the court with jurisdiction. It was only as an "alternate basis for reaching the same result" that the court addressed the constitutional issue.

**1.** *Niemotko v. Maryland*, 340 U.S. 268, 273, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951) (Frankfurter, J., concurring in the result).

The importance of the result here, both in terms of future constitutional interpretation and potential impact on government educational programs, has already attracted the attention of a number of commentators. Also, we have been advised by counsel that government officials, as well as the parties before this Court on appeal, view this case as a "test" of the constitutional limits on public school courses in transcendental meditation.

**2.** 440 F.Supp. at 1312.

aspects of the case are more apparent than real.[3]

It is my view that the teachings of those cases cited by the district court do indeed suggest the result reached by that court and affirmed today. But, as Judge Meanor's opinion amply illustrates, those opinions involve substantially different facts and problems than are presented here. And although the application of such cases to the factual situation here may be warranted, such an application is an extension of existing case law, and thus calls for both an explanation and a justification.

For purposes of the issues posed by this controversy, the arguably relevant decisional law may be divided into four principal groupings: cases announcing the traditional definition of religion, cases dealing with prayers recited in school, cases involving the conscientious objector exemption to the selective service laws, and cases touching on the newer constitutional definition of religion. Although the district court, and apparently the majority of this Court, consider these decisions to be controlling on the question raised here, careful reflection reveals as many differences as similarities.

### A. The Traditional Definition of Religion

The original definition of religion prevalent in this country was closely tied to a belief in God. James Madison called religion "the duty which we owe to our creator, and the manner of discharging it."[4] Basically, this was the position of the Supreme Court at the end of the nineteenth century. In *Davis v. Beason*, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890), the Court declared:

[T]he term "religion" has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will.[5]

This attitude remained unchallenged for many years. Chief Justice Hughes, writing a dissent in 1931, could conclude without concern that

[t]he essence of religion is belief in a relation to God involving duties superior to those arising from any human relation.[6]

Thus, the traditional definition was grounded upon a Theistic perception of religion. It is not clear, however, given the absence of any concentration in SCI/TM on a "Supreme Being," that it may be considered a religion under this traditional formulation.

### B. The School Prayer Cases

Facially, the Supreme Court decisions arguably most pertinent to this case are those involving school prayer. This is so, as I read the opinions of the district court and the majority of this Court, because an integral part of the preparation of the students for the practice of TM is the performance in Sanskrit of a chant, called the Puja. Accordingly, we are urged to engage in a "textual analysis" of the Puja, and then to compare that analysis to the prayers outlawed in the school prayer cases. In that the English translation of the Puja sounds at least as "religious" as the New York Regents prayer invalidated in *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), for instance, it is suggested that this case may be properly disposed of under that rubric.

I am not convinced, however, that the school prayer opinions provide particularly persuasive precedents for the resolution of

---

3. *Id.* 1320.

4. Madison, *A Memorial and Remonstrance on the Religious Rights of Man* in Cornerstones of Religious Freedom in America 84 (J. Bleu ed. 1964).

5. 133 U.S. at 342, 10 S.Ct. at 300.

6. *United States v. Macintosh*, 283 U.S. 605, 633–34, 51 S.Ct. 570, 578, 75 L.Ed. 1302 (1931) (Hughes, C. J., dissenting).

the question presented here.[7] *Engel* concerned a prayer[8] composed by the New York Board of Regents that had to be said aloud in every public school classroom by order of the local board of education, acting in its official capacity under state law. Students could be excused from attendance in a classroom where the prayer was said, but they needed the written request of a parent or guardian, and, of course, would have to take the initiative, and possible social consequences, if they chose to leave their classrooms during the recital of the prayer. That the prayer itself was religious in nature was not questioned. Indeed, it was specifically recommended by the Regents as an aid in "spiritual training" in the schools.

Similar to *Engel* is *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). There, the Court invalidated a Pennsylvania statute that required the reading of at least ten verses of the Bible, without comment, at the opening of each school day. As in *Engel*, participation was voluntary in the sense that a child could be excused from the exercise, although Mr. Schempp had declined to have his children excused because he feared they would suffer social ostracism by their teachers and classmates.[9] That the reading of the verses of the Bible was reli-

gious in nature does not seem to have been questioned by any of the parties or Justices who heard the appeal, although it was argued that a secular as well as a religious purpose was served by the readings.[10]

The constitutional problems in *Engel* and *Schempp* are relatively straightforward. First, it is clear that the State, through the edict of a state agency or by statute, may not seek to require that school districts engage in a particular form of obviously religious activity. Such religious partisanship, even though nonsectarian, is forbidden by the establishment clause. Second, the general nature of the activities raised serious free exercise questions because they were "voluntary" only in form, not in practice.[11] In order to avoid the official exercises, individual students had to take specific steps that were almost certain to draw attention to them, attention that was unlikely to be desirable, given the majority orientation of the religious practices. In neither case was the "wording" of the exercises of particular importance in resolving the constitutional problem.

Lower court decisions deflecting efforts to introduce prayers into public schools have expanded the teachings of *Engel* and *Schempp* to reach almost any prayer recited as such on school grounds,[12] but none has

---

7. Nor am I persuaded that "textual analysis"— the comparison of wording of alleged prayers— is a meaningful way to scrutinize establishment clause cases. The actual wording of a school exercise, for example, may be far less important than its context and purpose. A textual analysis might well invalidate the pledge of allegiance, the singing of "America the Beautiful," or the performance of certain works from Handel or Bach by a school glee club. Yet, such activities have not been held to violate the establishment clause, even though they include references to God or a Supreme Being, because they are undertaken for patriotic, cultural or other secular reasons, and neither have, nor are intended to have, a religious effect on those participating in or witnessing them. These exercises, in other words, are not "prayers" within the meaning of *Engel* or *Schempp*.

8. The Regents Prayer read:
   · Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country.

9. 374 U.S. at 208 n.3, 83 S.Ct. 1560.

10. *See id.* at 278–81, 83 S.Ct. at 1600–03 (Brennan, J., concurring).

11. *But see* Justice Stewart's dissenting opinion in *Schempp*, 374 U.S. at 308, 83 S.Ct. at 1616. Justice Stewart was unpersuaded that the activities were not genuinely voluntary, and voted to remand for a further hearing on that issue.

12. *See, e. g. DeSpain v. DeKalb Community School Dist.*, 384 F.2d 836 (7th Cir. 1967), *cert.*

sought to label as "religious" that which was presented as "nonreligious." [13]

In contrast, appellants here unwaveringly insist that the Puja chant has no religious meaning whatsoever and is, in fact, a "secular Puja," quite common in Eastern cultures. And, even if we reject this claim, we are still substantially removed from the facts of *Engel* and *Schempp:* (a) the Puja was never performed in a school classroom, or even on government property; (b) it was never performed during school hours, but only on a Sunday; (c) it was performed only once in the case of each student; (d) it was entirely in Sanskrit, with neither the student nor, apparently, the teacher who chanted it, knowing what the foreign words meant.

Moreover, the elements of involuntariness present in *Engel* and *Schempp* are wholly absent here. The SCI/TM course was an elective. No student in this case had to abandon his home classroom at the start of each school day or in any way risk notoriety for conscience sake. Only those students who sought a course in SCI/TM had any contact with the chant; they were specifically told that the chant had no religious meaning; and they stated in affidavits that

they did not understand it to have such meaning.[14]

Most important for our purposes, however, a court might resolve a challenge to the Puja under the school prayer cases, those cases provide few insights regarding the constitutional definition of religion. Both the prayer in *Engel* and the Bible readings in *Schempp* are unquestionably and uncompromisingly Theist. Even under the most narrow and traditional definition of religion, prayers to a Supreme Being and readings from the Bible would be considered "religious." [15] But the important question presented by the present litigation is how far the constitutional definition of religion extends beyond the Theistic formulation; that it comprehends all Theistic faiths has, to my knowledge, not been questioned. The school prayer cases, then, cannot be said to control, or, it would seem, even to address the question whether a particular belief-system should be considered a religion for first amendment purposes.

### C.  The Conscientious Objector Cases

In contradistinction to the school prayer cases, *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) and *Welsh v. United States*, 398 U.S. 333, 90

---

denied, 390 U.S. 906, 88 S.Ct. 815, 19 L.Ed.2d 873 (1968); *Stein v. Oshinsky*, 348 F.2d 999 (2d Cir.), *cert. denied* 382 U.S. 957, 86 S.Ct. 435, 15 L.Ed.2d 361 (1965); *Goodwin v. Cross Country School Dist. No. 7*, 394 F.Supp. 417 (E.D.Ark. 1973); *American Civil Liberties Union v. Gallatin Area School Dist.*, 307 F.Supp. 637 (W.D.Pa. 1969); *Lynch v. Indiana State Univ. Bd. of Trustees*, 378 N.E.2d 900 (Ind.Ct.App.1978).

**13.**  A possible exception is *DeSpain, supra* n.12. There kindergarten children were required to recite the following verse before receiving their morning snack:

    We thank you for the flowers so sweet;
    We thank you for the food we eat;
    We thank you for the birds that sing;
    We thank you for everything.

The Court of appeals for the Seventh Circuit reversed a district court determination that such was not a prayer or religious activity.

**14.**  It is not meant to suggest that the Puja has no relationship to the ultimate issue of this case. In my view, however, the chant is only one factor to be considered in determining whether SCI/TM itself is a religion. The Puja, because of its ceremonial aspects, may be supportive of the answer supplied to that question, but it does not answer it by itself. Moreover, even if the Puja alone were found to be religious, the proper remedy might well be to enjoin that particular ceremony only, and not to interdict the entire SCI/TM course.

**15.**  *See* I A *supra*. There is nothing in the school prayer cases incompatible with the traditional definition of "religion." Yet, despite their reliance on these cases involving admittedly Theistic prayers, neither the district court nor the majority of this Court appear to rest their result on a conclusion that SCI/TM is properly classified as a traditional Theistic faith.

S.Ct. 1792, 26 L.Ed.2d 308 (1970), the leading selective service decisions bespeak a broader definition of religion. *Seeger* and *Welsh*, of course, are not constitutional cases but rather concern the proper interpretation of section 6(j) of the Universal Military Service and Training Act.[16] This provision allowed for conscientious objector status for those who, "by reason of religious training and belief," were "opposed to participation in war in any form." The statute went on to define "religious training or belief" in Theistic terms.[17]

The Supreme Court, in what has been characterized as "a remarkable feat of linguistic transmutation," [18] recast the language of section 6(j) in order to give the exemption a much broader scope. Thus Seeger was granted C.O. status notwithstanding his refusal to affirm his faith in a Supreme Being because the Court concluded that "religious training and belief" encompass non-Theist faiths provided that they are "sincere religious beliefs which [are] based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent." [19] Welsh was similarly favored despite his assertion of only "moral" opposition to war, but in his case the Court was sharply divided.

Although *Seeger* and *Welsh* turned on statutory interpretation, and despite some indication that the Court has, to some degree, drawn back from the broadest possible reading of these cases,[20] they remain constitutionally significant. As a matter of logic and language, if the Court is willing to read "religious belief" so as to comprehend beliefs based upon pantheistic and ethical views, it might be presumed to favor a similar inclusive definition of "religion" as that term appears in the first amendment. Such logical conclusion has considerably more force when one considers the varying contexts of the language in question. As the district judge perceptively observed: "the Court defined the phrase broadly in an exercise of statutory construction, an area in which the Court is far more circumscribed in defining terms than it is in the area of constitutional interpretation." [21] It can hardly be denied that the Supreme Court's reading of the statutory language was strained at best. The Court's willingness to depart so drastically from the plain language of a statute in order to produce an expansive definition almost certainly unin-

---

**16.** 50 U.S.C. App. § 456(j) (1970).

**17.** "Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code." · 62 Stat. 612. This was the statutory language applicable to both *Seeger* and *Welsh*, although Congress deleted the reference to a "Supreme Being" in 1967, apparently in response to the *Seeger* case. See *Welsh v. United States*, 398 U.S. 333, 336 & n. 2, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

**18.** Note, *Toward a Constitutional Definition of Religion*, 91 Harv.L.Rev. 1056, 1065 n.60 (1978).

**19.** 380 U.S. at 176, 85 S.Ct. at 859. Seeger had declared his faith to be a "belief in and devotion to goodness and virtue for their own sakes, and a religious faith in a purely ethical creed."

*Id.* 166, 85 S.Ct. 854. A similar result was reached in a comparison case, *United States v. Peter.* Peter based his claim for C.O. status on a belief supported by and similar to the somewhat pantheistic views of Rev. John Haynes Holmes, who defined religion as "the consciousness of some power manifest in nature which helps man in the ordering of his life in harmony with its demands . . . [it] is the supreme expression of human nature; it is man thinking his highest, feeling his deepest, and living his best." *Id.* 166, 85 S.Ct. 856.

**20.** *See Wisconsin v. Yoder,* 406 U.S. 205, 216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (distinguishing personal and philosophical views from religious views). This apparent retrenchment was sharply criticized by Justice Douglas. *Id.* 247–49, 92 S.Ct. 1549–50 (Douglas, J., dissenting in part).

**21.** 440 F.Supp. at 1314.

tended by Congress, implies, as Justice Harlan observed in *Welsh*, a "distortion to avert an inevitable constitutional collision." [22]

Most importantly, the constitutional values prompting such a statutory construction can only be taken to suggest a broad definition of religion. Only four Justices explicitly discussed their constitutional concerns in *Welsh*. Justice Harlan was forthright in stating the problem:

> The constitutional question that must be faced in this case is whether a statute that defers to the individual's conscience only when his views emanate from adherence to theistic religious beliefs is within the power of Congress. Congress, . . having chosen to exempt, . . . cannot draw the line between theistic or non-theistic religious beliefs on the one hand and secular beliefs on the other. Any such distinctions are not, in my view, compatible with the Establishment Clause of the First Amendment.[23]

Justice Harlan found § 6(j) constitutionally deficient for two reasons. First, the subsection appeared to prefer the religious over the secular. Second, despite what the Court had said in *Seeger*, Justice Harlan also argued that on its face the statute favored Theistic religions over non-Theistic beliefs and, therefore, "disadvantages adherents of religions that do not worship a Supreme Being." [24] Thus Justice Harlan explicitly recognized as "religions" various non-Theistic belief systems.[25]

The three dissenters, speaking through Justice White, were unprepared to extend § 6(j) to those professing no more than a philosophical or moral view. To Justice Harlan's assertion that such a result favors the religious over the secular, they replied that this was permissible as an accommodation of free exercise clause values. They dissented, then, because they were willing to read this accommodation as extending only to those with genuinely religious views,—whether Theistic or non-Theistic—and not to those with purely secular ideas to whom the free exercise clause offered "no protection whatsoever." [26] Justice White's implicit definition of religion, therefore, included non-Theists but excluded economic, philosophical or merely personal opinions, however sincerely held.

In sum, then, all four Justices who addressed the constitutional issue concluded that "religion" should not be confined to a Theistic definition. Although four other Justices rested on statutory grounds and no exact definition was forthcoming in any event, *Seeger* and *Welsh* point to a definition at least somewhat broader than that advanced in the earlier decisions of the Supreme Court.

### D. Cases Suggesting a New Constitutional Definition

*Seeger* and *Welsh,* however, are not the only cases presaging a broader reading of "religion" for first amendment purposes. The district court notes other cases more directly on point in that they concern constitutional, not statutory challenges.

The most important of these, and the only Supreme Court cases among them, is *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). *Torcaso* involved a direct constitutional challenge to a Maryland provision that required an official to declare a belief in God in order to hold office in that state. A unanimous Court rejected this requirement, both as a matter of establishment clause values (the state may not favor Theism over pantheism or atheism) and free exercise clause values (an

---

**22.** 398 U.S. at 354, 90 S.Ct. at 1804.

**23.** 398 U.S. at 356, 90 S.Ct. at 1805 (Harlan, J., concurring).

**24.** *Id.* 357, 90 S.Ct. at 1805.

**25.** In so doing, Justice Harlan was not striking out on a new path. He relied specifically on *Torcaso v. Watkins*, 367 U.S. 488, 495 n.11, 81 S.Ct. 1680, 6 L.Ed.2d 982, discussed *infra* at 205–206.

**26.** *Id.* 374, 90 S.Ct. 1814 (White, J., dissenting).

individual may not be barred from holding public office on the basis of his beliefs). In striking down the Maryland law, the Court specifically observed that neither the state nor the federal government "can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs."[27] The Court then added an instructive footnote:

> Among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and others. *See Washington Ethical Society v. District of Columbia*, 101 U.S.App.D.C. 371, 249 F.2d 127; *Fellowship of Humanity v. County of Alameda*, 153 Cal.App.2d 673, 315 P.2d 394; II Encyclopaedia of the Social Sciences 293; 4 Encyclopaedia Britannica (1957 ed.) 325–327; 21 *id.*, at 797; Archer, Faiths Men Live By (2d ed. revised by Purinton), 120–138, 254–313; 1961 World Almanac 695, 712; Year Book of American Churches for 1961, at 29, 47.[28]

This note, although dictum, represents a rejection of the view that religion may, consonant with first amendment values, be defined solely in terms of a Supreme Being. Buddhism and Taoism are, of course, recognized Eastern religions. The other two examples given by the Court refer to explicitly non-Theist organized groups, discussed in cases cited in the footnote, that were found to be religious for tax exemption purposes primarily because of their organizational similarity to traditional American church groups. "Ethical Culture" is a reference to the organization in *Washington Ethical Society v. District of Columbia*, 101 U.S.App. D.C. 371, 249 F.2d 127 (1957), which held regular Sunday services and espoused a group of defined moral precepts. Similarly, "Secular Humanism," however broad the term may sound, appears to be no more than a reference to the group seeking an exemption in *Fellowship of Humanity v. County of Alameda*, 153 Cal.App.2d 673, 315 P.2d 394 (1957) which, although non-Theist in belief, also met weekly on Sundays and functioned much like a church. In any event, the Court was willing to concede that these groups, "and others," were religious for constitutional purposes.

The broad reading of "religion" in *Torcaso* was drawn upon in *Founding Church of Scientology v. United States*, 133 U.S.App. D.C. 229, 409 F.2d 1146, *cert. denied*, 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969). There, Scientology, a belief system providing a "general account of man and his nature comparable in scope, if not in content, to those of some organized religions," was found to be a religion for purposes of the free exercise clause.[29] Judge Wright was willing to accept, as religious, ideas that are sufficiently comprehensive to be comparable to traditional religions in terms of content and subject matter. But it must be added that he did so only after observing that the government did not contest Scientology's religious nature, or rebut the prima facie case for religious classification made by its supporters.[30]

---

27. 367 U.S. at 495, 81 S.Ct. at 1683–84.

28. *Id.* n.11.

29. The Church of Scientology sought to avoid federal labeling and regulatory requirements for its "E-meter," a device designed to read brain imprints. Scientology is not universally conceded to be a religion. *See Missouri Church of Scientology v. State Tax Comm'n.*, 560 S.W.2d 837, 842 (Mo.1977) (applying a "Supreme Being" test to disqualify Scientology for a state tax exemption).

30. Although the broader definition of religion has been applied in several free exercise cases arising in different contexts, it cannot be said to have completely carried the field. *Compare Remmers v. Brewer*, 361 F.Supp. 537 (S.D.Iowa 1973), *aff'd per curiam*, 494 F.2d 1277 (8th Cir.), *cert. denied*, 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286 (1974) *with Theriault v. Carlson*, 495 F.2d 390 (5th Cir.), *cert. denied* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974). *Compare People v. Woody*, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (Cal.1964) *with In re McMillan*, 30 N.C.App. 235, 226 S.E.2d 693 (1976). It should be noted that many of the

It would thus appear that the constitutional cases that have actually alluded to the definitional problem, like the selective service cases, strongly support a definition for religion broader than the Theistic formulation of the earlier Supreme Court cases. What this definition is, or should be, has not yet been made entirely clear.

## II—THE MODERN DEFINITION OF RELIGION

It seems unavoidable, from *Seeger*, *Welsh*, and *Torcaso*, that the Theistic formulation presumed to be applicable in the late nineteenth century cases is no longer sustainable. Under the modern view, "religion" is not confined to the relationship of man with his Creator, either as a matter of law or as a matter of theology. Even theologians of traditionally recognized faiths have moved away from a strictly Theistic approach in explaining their own religions.[31] Such movement, when coupled with the growth in the United States, of many Eastern and non-traditional belief systems, suggests that the older, limited definition would deny "religious" identification to faiths now adhered to by millions of Americans. The Court's more recent cases reject such a result.

If the old definition has been repudiated, however, the new definition remains not yet fully formed. It would appear to be properly described as a definition by analogy. The *Seeger* court advertently declined to distinguish beliefs holding "parallel positions in the lives of their respective holders."[32] Presumably beliefs holding the same important position for members of one of the new religions as the traditional faith holds for more orthodox believers are entitled to the same treatment as the traditional beliefs. The tax exemption cases referred to in *Torcaso* also rely primarily on the common elements present in the new challenged groups—the Ethical Society and the Fellowship of Humanity—as well as in the older unchallenged groups and churches. In like fashion, Judge Wright reasoned by analogy in crediting the prima facie claim made out for Scientology in *Founding Church of Scientology, supra.*[33] The modern approach thus looks to the familiar religions as models in order to ascertain, by comparison, whether the new set of ideas or beliefs is confronting the same concerns, or serving the same purposes, as unquestioned and accepted "religions."

But it is one thing to conclude "by analogy" that a particular group or cluster of ideas is religious; it is quite another to explain exactly what indicia are to be looked to in making such an analogy and justifying it. There appear to be three

cases confronting this dilemma seem to involve the sincerity of the claimed religious view as much as the status of that view. *See, e. g., United States v. Kuch*, 288 F.Supp. 439 (D.D.C. 1968). *See generally,* Comment, *The Religious Rights of the Incarcerated*, 125 U.Pa.L.Rev. 812 (1977).

**31.** *See, e. g.,* T. Altizer, The Gospel of Christian Atheism (1966); H. Cox, The Secular City 1–2 (1966); R. Richard, Secularization Theology (1967); G. Gutierrez, A Theology of Liberation (1973); P. Tillich, The Shaking of the Foundations (1972). *See generally,* Note, *Toward a Constitutional Definition of Religion*, 91 Harv. L.Rev. 1056, 1066–72 (1978).

**32.** 380 U.S. at 166, 85 S.Ct. at 854.

**33.** . . . is Scientology a religion? On the record as a whole, we find that appellants have made out a *prima facie* case that the Founding Church of Scientology is a religion. It is incorporated as such in the District of Columbia. It has ministers, who are licensed as such, with legal authority to marry and to bury. Its fundamental writings contain a general account of man and his nature comparable in scope, if not in content, to those of some recognized religions. The fact that it postulates no deity in the conventional sense does not preclude its status as a religion.

The Government might have chosen to contest the claim that the Founding Church was in fact a religion. Not every enterprise cloaking itself in the name of religion can claim the constitutional protection conferred by that status. It might be possible to show that a self-proclaimed religion was merely a commercial enterprise, without the underlying theories of man's nature or his place in the Universe which characterize recognized religions.

409 F.2d at 1160. (citations omitted)

useful indicia that are basic to our traditional religions and that are themselves related to the values that undergird the first amendment.

The first and most important of these indicia is the nature of the ideas in question. This means that a court must, at least to a degree, examine the content of the supposed religion, not to determine its truth or falsity, or whether it is schismatic or orthodox, but to determine whether the subject matter it comprehends is consistent with the assertion that it is, or is not, a religion.[34] Thus the court was able to remark in *Founding Church of Scientology*:

> It might be possible to show that a self-proclaimed religion was merely a commercial enterprise, *without the underlying theories of man's nature or his place in the Universe which characterize recognized religions.*[35]

Similarly, one of the conscientious objectors whose appeal was coupled with *Seeger*, submitted a long memorandum, noted by the Court, in which he defined religion as the *"sum and essence of one's basic attitudes to the fundamental problems of human existence."*[36]

Expectation that religious ideas should address fundamental questions is in some ways comparable to the reasoning of the Protestant theologian Dr. Paul Tillich, who expressed his view on the essence of religion in the phrase "ultimate concern."[37] Tillich perceived religion as intimately connected to concepts that are of the greatest depth and utmost importance. His thoughts have been influential both with courts and commentators.[38] Nor is it difficult to see why this philosophy would prove attractive in the American constitutional framework. One's views, be they orthodox or novel, on the deeper and more imponderable questions—the meaning of life and death, man's role in the Universe, the proper moral code of right and wrong—are those likely to be the most "intensely personal"[39] and important to the believer. They are his ultimate concerns. As such, they are to be carefully guarded from governmental interference, and never converted into official government doctrine. The first amendment demonstrates a specific solicitude for religion because religious ideas are in many ways more important than other ideas. New and different ways of meeting those concerns are entitled to the same sort of treatment as the traditional forms.

Thus, the "ultimate" nature of the ideas presented is the most important and convincing evidence that they should be treated as religious.[40] Certain isolated answers

---

34. Courts are sharply limited in any review of the content of religious ideas. *See Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Compare the earlier approach of *Late Corporation of the Church of Jesus Christ of Latter-Day Saints v. United States,* 136 U.S. 1, 49–50, 10 S.Ct. 792, 34 L.Ed. 478 (1890). Some judges have been uneasy with any content analysis whatever. *See United States v. Ballard,* 322 U.S. 78, 92, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (Jackson, J., dissenting).

35. 409 F.2d at 1160 (emphasis supplied).

36. 380 U.S. at 168, 85 S.Ct. at 855.

37. P. Tillich, Dynamics of Faith 1–2 (1958).

38. *See, e. g., United States v. Seeger,* 380 U.S. 163, 187, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Religious Liberty, Nonestablishment, and Doctrinal Development—Part I. The Religious Liberty Guarantee,* 80 Harv.L.Rev. 1381, 1424–26 (1967); Note, *Toward a Constitutional Definition of Religion,* 91 Harv.L.Rev. 1056, 1066–68 (1978).

39. 380 U.S. at 184, 85 S.Ct. 850.

40. It should not be reasoned from this that those teachings of accepted religious groups that do not address "ultimate" matters are not entitled to religious status. Many religions are sufficiently comprehensive to include rules or views on very ordinary matters such as diet, periods for rest, and dress. These are not themselves "ultimate concerns," but they are intimately connected to a religion that does address such concerns. Once a belief-system has been credited as a "religion" through an

to "ultimate" questions, however, are not necessarily "religious" answers, because they lack the element of comprehensiveness, the second of the three indicia. A religion is not generally confined to one question or one moral teaching; it has a broader scope. It lays claim to an ultimate and comprehensive "truth." Thus the so-called "Big Bang" theory, an astronomical interpretation of the creation of the universe, may be said to answer an "ultimate" question, but it is not, by itself, a "religious" idea. Likewise, moral or patriotic views are not by themselves "religious," but if they are pressed as divine law or a part of a comprehensive belief-system that presents them as "truth," they might well rise to the religious level.

The component of comprehensiveness is particularly relevant in the context of state education. A science course may touch on many ultimate concerns,[41] but it is unlikely to proffer a systematic series of answers to them that might begin to resemble a religion. St. Thomas Aquinas once defined theology by asserting,

> . . . this science commands all the other sciences as the ruling science. . . This science uses for its service all the

other sciences, as though its vassals, . . . .[42]

The teaching of isolated theories that might be thought to address "ultimate" questions is not the teaching of such a "ruling science." When these theories are combined into a comprehensive belief system, however, the result may well become such a "ruling science" that overflows into other academic disciplines as the guiding idea of the student's pursuits. It is just such a "ruling science" that the establishment clause guards against.

A third element to consider in ascertaining whether a set of ideas should be classified as a religion is any formal, external, or surface signs that may be analogized to accepted religions. Such signs might include formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observation of holidays and other similar manifestations associated with the traditional religions. Of course, a religion may exist without any of these signs,[43] so they are not determinative, at least by their absence, in resolving a question of definition. But they can be helpful in supporting a conclusion of religious status given the important role such ceremonies play in religious life.[44]

---

examination of its "ultimate" nature, its teachings on other matters must also be accepted as religious.

**41.** It is a widespread practice in high school biology courses, for instance, to include discussion of Darwin's theory of evolution. This theory is offensive to some religious groups, but it is not in itself religious. For a thoughtful discussion of this problem, *see,* Note, *Freedom of Religion and Science Instruction in Public Schools,* 87 Yale L.J. 515 (1978).

**42.** Aquinas, Prologue to *Commentary of IV Books of Sentences, reprinted in* An Aquinas Reader (M. Clark, ed. 1972) at 411.

**43.** The individuals seeking draft exemptions in *Seeger* and *Welsh, supra,* were found to be religiously motivated. But their views were largely personal, and the conclusion that they were religiously based could not be supported by the existence of any formal, ceremonial or organizational trappings. On the other hand, purely personal ideas, even if sincere, may not

rise to a religious level. *See Wisconsin v. Yoder,* 406 U.S. 205, 216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (dictum). It is, therefore, possible that solely individual beliefs must look to other constitutional provisions for protection. If this is true, formal and organizational signs may prove to be more important in defining religion than the conscientious objector cases would suggest.

**44.** "The really religious beliefs are always common to a determined group which makes profession of adhering to them and to practicing rites connected with them . . . . In all history, we do not find a single religion without a Church." E. Durkheim, The Elementary Forms of the Religious Life 43–44 (1915). *See* K. Dunlap, Religion: Its Functions in Human Life 255–70 (1946); E. Underhill, Worship 20–41 (1937). *See generally* Note, *Transcendental Meditation and the Meaning of Religion Under the Establishment Clause,* 62 Minn.L.Rev. 887, 906–08 (1978).

These formal signs of religion were found to be persuasive proofs of religious character for tax exemption purposes in *Washington Ethical Society* and *Fellowship of Humanity,* discussed *supra.* They are noted as well in *Founding Church of Scientology supra.* Thus, even if it is true that a religion can exist without rituals and structure, they may nonetheless be useful signs that a group or belief system is religious.

Although these indicia will be helpful, they should not be thought of as a final "test" for religion. Defining religion is a sensitive and important legal duty.[45] Flexibility and careful consideration of each belief system are needed. Still, it is important to have some objective guidelines in order to avoid *ad hoc* justice.

Before applying these guidelines to SCI/TM, however, a separate question must first be examined. Even conceding the propriety of the modern approach in certain contexts, the Court is urged to adopt the position that a less expansive definition is required in establishment clause cases. The broader definition has up until now been exclusively applied in response to free exercise clause values. Appellants contend that such broader definition is inappropriate in the context of the establishment clause.

## III—A UNITARY DEFINITION FOR BOTH RELIGION CLAUSES

There has been considerable speculation whether the broader definition of religion developed in the free exercise cases should be applied under the establishment clause. Professor Tribe of Harvard has advanced the argument that the free exercise clause should be read broadly to include anything "arguably religious," but that the establishment clause should not be construed to encompass anything "arguably non-religious." In so doing, he has summarized the position of those favoring a dual definition:

> Clearly, the notion of religion in the free exercise clause must be expanded beyond the closely bounded limits of theism to account for the multiplying forms of recognizably legitimate religious exercise. It is equally clear, however, that in the age of the affirmative and increasingly pervasive state, a less expansive notion of religion was required for establishment clause purposes lest all "humane" programs of government be deemed constitutionally suspect. Such a twofold definition of religion—expansive for the free exercise clause, less so for the establishment clause—may be necessary to avoid confronting the state with increasingly difficult choices that the theory of permissible accommodation . . . could not indefinitely resolve.[46]

---

**45.** Appellants have urged that they do not consider SCI/TM to be a religion. But the question of the definition of religion for first amendment purposes is one for the courts, and is not controlled by the subjective perceptions of believers. Supporters of new belief systems may not "choose" to be non-religious, particularly in the establishment clause context. As the *Welsh* court stated, albeit in a very different context:

> The Court's statement in *Seeger* that a registrant's characterization of his own belief as "religious" should carry great weight, 380 U.S. at 184, 85 S.Ct. 850, does not imply that his declaration that his views are nonreligious should be treated similarly.

398 U.S. at 341, 90 S.Ct. at 1797. There is some indication that SCI/TM has attempted a transformation from a religion to a secular science in order to gain access to the public schools. *See* Note, *Transcendental Meditation*

*and the Meaning of Religion Under the Establishment Clause,* 62 Minn.L.Rev. 887, 912–13 (1978). Even if this is true, the issue of its religious nature remains a legal question, and the judgment of the Court today represents a conclusion, in effect, that the attempted transformation is not complete.

**46.** L. Tribe, American Constitutional Law 827–28 (1978). Tribe's principal example is particularly relevant to the question presented here:

> Consider, for example, the curious lawsuit in *Malnak v. Maharishi Mahesh Yogi,* where plaintiffs contend that the New Jersey school system is violating the establishment clause by allowing licensed teachers to use public school facilities to teach Transcendental Meditation (TM) as an elective course. The TM course trains students in a method or process of meditation. For some, it is a religion; but for thousands of people throughout the coun-

Another commentator has come to the same conclusion, apparently for the same underlying reasons:

> To borrow the ultimate concern test from the free exercise context and use it with present establishment clause doctrines would be to invite attack on all programs that further the ultimate concerns of individuals or entangle the government with such concerns. Doctrinal chaos might well result, and with it might come the wholesale invalidation of programs which, if analyzed in light of the values underlying the establishment clause, would be found benign.[47]

This view is not without other academic[48] and some judicial[49] support, and appellants here urge upon us a modified version of it.[50]

Despite the distinguished scholars who advocate this approach, a stronger argument can be made for a unitary definition to prevail for both clauses. This would seem to be the preferable choice for several reasons. First, it is virtually required by the language of the first amendment. As Justice Rutledge put it over thirty years ago:

> "Religion" appears only once in the Amendment. But the word governs two prohibitions and governs them alike. It does not have two meanings, one narrow to forbid "an establishment" and another, much broader, for securing "the free exercise thereof." "Thereof" brings down "religion" with its entire and exact content, no more and no less, from the first into the second guaranty, so that Congress and now the states are as broadly restricted concerning the one as they are regarding the other.[51]

Although the Constitution has often been subject to a broad construction, it remains a written document. It is difficult to justify a reading of the first amendment so as to

try it is a mental exercise, often engaged in by enthusiastic adherents of such formal religions as Christianity, Judaism, and Mohammedanism. Clearly, TM should be deemed a religion for purposes of the free exercise clause: if the government sought to forbid it as an activity, the free exercise clause would stand in the way. But if the same definition of religion were adopted for the establishment clause, offering the course proposed in *Malnak* would be unconstitutional even though many plausibly regard it as no more "religious" than courses in methods of concentration or body control. Are the teaching of psychology or of self-hypnosis forbidden by the establishment clause?

*Id.* Professor Tribe wrote before the facts of this case had been developed. He views the course as one in TM, not SCI/TM. Whether he would consider this particular SCI/TM course to be "arguably non-religious" is not entirely clear from the above. In any event, the teaching of this course is readily distinguishable from instruction in psychology or self-hypnosis.

**47.** Note, *Toward a Constitutional Definition of Religion*, 91 Harv.L.Rev. 1056, 1084 (1978). The Harvard illustration differs from Tribe's:

> For example, the Secularization movement in contemporary Christianity is unquestionably deserving of protection under the free exercise clause. Yet, the conclusion that Secularization Theology is a religion for establishment clause purposes might lead some to conclude that numerous humanitarian government programs should be regarded as unconstitutional.

*Id.*

**48.** Indeed, even a limited review of the commentators indicates that a dual definition is endorsed by a substantial majority of those who have addressed the question. *See, e. g.*, Freund, *Public Aid to Parochial Schools*, 82 Harv.L.Rev. 1680, 1686–87 n.14 (1969) ("It may be suggested that a conventional definition of religion or religious practice is controlling in applying the non-establishment clause, while a heterodox version is entitled to protection under the free exercise clause, which safeguards the nonconformist conscience."); Galanter, *Religious Freedom in the United States: A Turning Point?* 1966 Wis.L.Rev. 217, 266.

**49.** *Sheldon v. Fannin*, 221 F.Supp. 766, 775 (D.Ariz.1963) (establishment clause definition looks to majority's concept of the term religion, free exercise clause definition to the minority's).

**50.** Brief for Appellants at 53–56.

**51.** *Everson v. Board of Education*, 330 U.S. 1, 32, 67 S.Ct. 504, 519, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting). Although the Court split over the comprehensiveness of the establishment clause, Rutledge's views on the unitary definition of religion were not disputed by the majority. A unitary definition is also endorsed by Judge Meanor in his opinion in this case. 440 F.Supp. at 1316 n.20, and would appear to be implicitly accepted by the majority of this Court.

support a dual definition of religion, nor has our attention been drawn to any support for such a view in the conventional sources that have been thought to reveal the intention of the framers. Moreover, the policy reasons put forward by the supporters of a dual definition, in my view at least, are unpersuasive.

The advocates of a dual definition appear to be motivated primarily by an anxiety that too extensive a definition under the establishment clause will lead to "wholesale invalidation" of government programs. Behind this fear lurks, I believe, too broad a reading of the teachings of *Seeger, Welsh,* and *Torcaso.* The selective service case did not hold that Seeger, Welsh and the other conscientious objectors were advancing views sufficient to qualify as a religion or religions, only that their views were based on religious belief. Were a school, or government agency, to advance the cause of peace, or opposition to war, such an official position would not qualify as a "religion" even though some citizens might come to adopt that very view because of their own religious beliefs. All programs or positions that entangle the government with issues and problems that might be classified as "ultimate concerns" do not, because of that, become "religious" programs or positions. Only if the government favors a comprehensive belief system and advances its teachings does it establish a religion. It does not do so by endorsing isolated moral precepts or by enacting humanitarian economic programs.

In this regard it should be noted that the modern definition of religion does not extend so far as to include those who hold beliefs—however passionately—regarding the utility of Keynesian economics, Social Democracy or, for that matter, Sociobiology. These ideas may in some instances touch on "ultimate concerns," but they are less analogous to religious views than they are to the political or sociological ideas that they are. Thus *Torcaso* does not stand for the proposition that "humanism" is a religion, although an organized group of "Secular Humanists" may be. An undefined belief in humanitarianism, or good intentions, is still far removed from a comprehensive belief system laying a claim to ultimate truth and supported by a formal group with religious trappings.[52]

Moreover, the establishment clause does not forbid government activity encouraged by the supporters of even the most orthodox of religions if that activity is itself not unconstitutional. The Biblical and clerical endorsement of laws against stealing and murder do not make such laws establishments of religion. Similarly, agitation for social welfare programs by progressive churchmen, even if motivated by the most orthodox of theological reasons, does not make those programs religious. The Constitution has not been interpreted to forbid those inspired by religious principle or conscience from participation in this nation's political, social and economic life.[53]

Finally, in addition to these doubts whether "doctrinal chaos" would in fact result from resort to the new definition in the establishment clause context, the practical result of a dual definition is itself troubling. Such an approach would create a three-tiered system of ideas: those that are unquestionably religious and thus both free from government interference and barred from receiving government support; those that are unquestionably non-religious and thus subject to government regulation and eligible to receive government support; and those that are only religious under the newer approach and thus free from governmental regulation but open to receipt of government support. That belief systems classi-

52. The reference to "Secular Humanism" in the *Torcaso* footnote appears to be to just such a group. *See Fellowship of Humanity, supra.* A more difficult question would be presented by government propagation of doctrinaire Marxism, either in the schools or elsewhere. Under certain circumstances Marxism might be classi-

fiable as a religion—and an establishment thereof could result.

53. *See McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (Tennessee constitutional provision restricting clergy from holding political office found unconstitutional).

fied in the third grouping are the most advantageously positioned is obvious. No reason has been advanced, however, for favoring the newer belief systems over the older ones. If a Roman Catholic is barred from receiving aid from the government, so too should be a Transcendental Meditator or a Scientologist if those two are to enjoy the preferred position guaranteed to them by the free exercise clause. It may be, of course, that they are not entitled to such a preferred position, but they are clearly not entitled to the advantages given by the first amendment while avoiding the apparent disadvantages. The rose cannot be had without the thorn.

For these reasons, then, I think it is correct to read religion broadly in both clauses and agree that the precedents developed in the free exercise context are properly relied upon here. Having reached this conclusion, two final questions remain: Does SCI/TM qualify as a religion under the criteria discussed above and, if it does, does the teaching and funding of this course constitute an establishment of that religion.

## IV—SCI/TM AS A RELIGION.

Although Transcendental Meditation by itself might be defended—as appellants sought to do in this appeal—as primarily a relaxation or concentration technique with no "ultimate" significance,[54] the New Jersey course at issue here was not a course in TM alone, but a course in the Science of Creative Intelligence. Creative Intelligence, according to the textbook in the record, is "at the basis of all growth and progress" and is, indeed, "the basis of everything." Transcendental Meditation is presented as a means for contacting this "impelling life force" so as to achieve "inner contentment." Creative Intelligence can provide such "contentment" because it is "a field of unlimited happiness," which is at work everywhere and visible in such diverse places as in "the changing of the seasons" and "the wings of a butterfly." That the existence of such a pervasive and fundamental life force is a matter of "ultimate concern" can hardly be questioned. It is put forth as the foundation of life and the world itself.[55]

The Science of Creative Intelligence provides answers to questions concerning the nature both of world and man, the underlying sustaining force of the universe, and the way to unlimited happiness. Although it is not as comprehensive as some religions—for example, it does not appear to include a complete or absolute moral code—it is nonetheless sufficiently comprehensive to avoid the suggestion of an isolated theory unconnected with any particular world view or basic belief system. SCI/TM provides a way—indeed in the eyes of its adherents *the way*—to full self realization and oneness with the underlying reality of the universe. Consequently, it can reasonably be understood as presenting a claim of ultimate "truth."

54. The religious significance of TM alone is disputed. It has been defended as wholly consistent with other religious views, and attacked by adherents of those religions as premeated with Hinduism. *Compare* D. Denniston & P. McWilliams, The TM Book 14–19 (1975) *with Beware of TM*, 19 Christianity Today 1168 (1975). The extent of its involvement with "ultimate concerns" might well vary from course to course. For a comprehensive survey of the literature for and against TM, and the distinctions between TM and SCI/TM *see* Note, *Transcendental Meditation and The Meaning of Religion Under the Establishment Clause*, 62 Minn.L.Rev. 887 (1978). The Minnesota commentator expresses considerable doubt that any TM course could pass constitutional muster. *Id.* 938–48.

55. Appellants have argued that Creative Intelligence is a science, not a religion, and that their claims for it are scientifically verifiable. But theology, too, may be regarded as a science, and many theologians in the past have thought that the existence of their God could be proved by reason. It is true that some of those favoring a broad definition of religion have suggested that one indicia of a religious nature is that such beliefs are not based on reason alone, but are to some extent based on faith. *See United States v. Kauten*, 133 F.2d 703, 708 (2d Cir. 1943); *Boyan, Defining Religion in Operational and Institutional Terms*, 116 U.Pa.L.Rev. 479, 485–86 (1968). I think it sufficient to conclude that a court cannot accept nor doubt a believer's assertion that his views are "true" and provable empirically. Such a controversy would involve an examination of the truth or falsity of beliefs rather than their nature.

This conclusion is supported by the formal observances and structure of SCI/TM. Although there is no evidence in the record of organized clergy or traditional rites, such as marriage, burial or the like, there are trained teachers and an organization devoted to the propagation of the faith. And there is a ceremony, the Puja, that is intimately associated with the transmission of the mantra. The mantra is a word communicated privately to each newly-inducted practitioner, which is said to be vital to transcendental meditation and access to the field of unlimited happiness.

SCI/TM is not a Theistic religion, but it is nonetheless a constitutionally protected religion. It concerns itself with the same search for ultimate truth as other religions and seeks to offer a comprehensive and critically important answer to the questions and doubts that haunt modern man. That those who espouse these views and engage in the Puja, or meditate in the hope of reaching the transcendental reality of creative intelligence, would be entitled to the protection of the free exercise clause if threatened by governmental interference or regulation is clear. They are thus similarly subject, in my view, to the constraints of the establishment clause. When the government seeks to encourage this version of ultimate truth, and not others, an establishment clause problem arises.

## V—THE NEW JERSEY SCI/TM COURSE AS AN ESTABLISHMENT OF RELIGION

Like the majority, I am convinced that the conclusion that SCI/TM is a religion is largely determinative of this appeal. There is nothing *per se* unconstitutional about offering a course in religion or religious writ-

ings. This was made clear by the Court in *Schempp* :

It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as part of a secular program of education, may not be affected consistently with the First Amendment.[56]

A realistic appraisal of the course at issue here, however, demonstrates no such objective secular program.

In applying the three-prong *Nyquist* test for determining whether a particular program abridges the establishment clause,[57] the district court credited the government with pursuing a secular purpose of sorts, but held that the means employed in pursuing this goal were forbidden by that clause:

Owing to the religious nature of the concept of the field of pure creative intelligence . . ., it is apparent that the governmental agencies have sought to effect a secular goal by the propagation of a religious concept, a belief in an unmanifest field of life, which is perfect, pure, and infinite. . . . These means of effecting ostensibly secular ends are prohibited by the establishment clause.[58]

I am in agreement with this conclusion, but entertain some doubt as to the secularity of purpose here. No federal or state agency has taken an appeal from the judgment of the district court, so we have not had the benefit of enlightenment as to what possible secular purpose was served by the decisions of the New Jersey educational authorities and the expenditure of federal tax dollars. Although a secular purpose, however unlikely, is usually conceded in establishment clause cases,[59] there is some ques-

---

56. *Abington School Dist. v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963).

57. *See Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). *Nyquist* forbids governmental action undertaken for primarily religious purposes, or having primarily religious effects, or leading to impermissible government entanglement with religion.

58. 440 F.Supp. at 1324.

59. *See* L. Tribe, American Constitutional Law § 14–8 (1978). The principal exception to this judicial willingness to find a secular purpose is *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (Arkansas statute forbidding the teaching of the theory of evolution in public schools held unconstitutional).

tion whether one can be found in the record here. A careful review of the transcript, and the content of the course, reveals nothing other than an effort to propagate TM, SCI, and the views of Maharishi Mahesh Yogi.[60] As the district court indicated, the government may have thought some "good" would come out of this instruction, but it is quite possible that some good would come out of instruction in the Protestant, Roman Catholic, Jewish or Islamic faiths. A conviction that religious education is "good" for students does not make out a secular purpose.

Religious observation and instruction in public schools may be sustainable if ideas are taught in an objective fashion, or if the overall impact of the religious observance is *de minimis*. Neither was true here. Once SCI/TM is found to be a religion, the establishment resulting from direct government support of that religion through the propagation of its religious ideas in the public school system is clear.

Although federal courts should be reluctant to interfere in the judgments of educational authorities on questions of what subject matter should be taught in the schools, our constitutional duty to guard against state efforts to promote religion may not be set aside out of deference to the policy choices of other officials. Whatever its merits, the program under consideration here, endorsed, as it is, by the State of New Jersey and the Department of Health, Education and Welfare, is forbidden by the first amendment. As such, it cannot stand.

---

**60.** It is of particular note that New Jersey did *not entrust the teaching of SCI/TM to* regular public school teachers, but relied upon instructors trained by appellant WPEC, whose commitment was not to broad based public education but to the propagation of its views.

Although the Constitution allows "objective" courses in religion, *see* Note 54 *supra,* courts are unlikely to find objectivity in courses taught by Jesuits, rabbis, or fundamentalist ministers brought in to the public schools for the express purpose of teaching that course. A comparable situation is presented here.