[No. B150017. Second Dist., Div. Five. Sept. 13, 2002.]

JEROLD DANIEL FRIEDMAN, Plaintiff and Appellant, v.
SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP et al.,
Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, parts I., II.A., II.B., II.C.1.-II.C.6., and III. of this opinion are certified for publication. The remainder of the opinion is not to be published.

**COUNSEL**

Myer Law Firm and Scott D. Myer for Plaintiff and Appellant.

Sefarth Shaw, F. Scott Page and Debbie L. Freedman for Defendants and Respondents.

## OPINION

### TURNER, P. J.—

## I. INTRODUCTION

Jerold Daniel Friedman (plaintiff) appeals from a judgment entered after the general demurrers of Southern California Permanente Medical Group, Kaiser Foundation Hospitals, and Kaiser Foundation Health Plan, Inc. (defendants), were sustained without leave to amend. In the published portion of this opinion, we resolve the question of whether veganism is a "religious creed" within the meaning of the California Fair Employment and Housing Act (FEHA), Government Code[1] section 12940. We conclude veganism is not a "religious creed" within the meaning of the FEHA. Accordingly, we affirm the judgment.

## II. DISCUSSION

### A. *Standard of Review*

Our Supreme Court has set forth the standard of review we must apply on appeal from a judgment following an order sustaining a demurrer without leave to amend as follows: "On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317]; accord, *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

### B. *The Complaint's Allegations of Religious Creed Discrimination*

The trial court sustained defendants' demurrers without leave to amend to plaintiff's first through third causes of action of his original complaint for

---

[1]All further statutory references are to the Government Code except where otherwise noted.

religious creed discrimination and retaliation in violation of the FEHA. The trial court concluded veganism was not a religious creed within the meaning of the FEHA. In his original complaint, plaintiff alleged as follows. He is a strict vegan. Further, he alleged: "As a strict Vegan, [plaintiff] fervently believes that all living beings must be valued equally and that it is immoral and unethical for humans to kill and exploit animals, even for food, clothing and the testing of product safety for humans, and that such use is a violation of natural law and the personal religious tenets on which [plaintiff] bases his foundational creeds. He lives each aspect of his life in accordance with this system of spiritual beliefs. As a Vegan, and his beliefs [*sic*], [plaintiff] cannot eat meat, dairy, eggs, honey or any other food which contains ingredients derived from animals. Additionally, [plaintiff] cannot wear leather, silk or any other material which comes from animals, and cannot use any products such as household cleansers, soap or toothpaste which have been tested for human safety on animals or derive any of their ingredients from animals. This belief system[] guides the way that he lives his life. [Plaintiff's] beliefs are spiritual in nature and set a course for his entire way of life; he would disregard elementary self-interest in preference to transgressing these tenets. [Plaintiff] holds these beliefs with the strength of traditional religious views, and has lived in accordance with his beliefs for over nine (9) years. As an example of the religious conviction that [plaintiff] holds in his Vegan beliefs, [plaintiff] has even been arrested for civil disobedience actions at animal rights demonstrations. This Vegan belief system guides the way that [plaintiff] lives his life. These are sincere and meaningful beliefs which occupy a place in [plaintiff's] life parallel to that filled by God in traditionally religious individuals adhering to the Christian, Jewish or Muslim Faiths."

Plaintiff was hired by a temporary agency to work for defendants as a computer contractor. He worked at a pharmaceutical warehouse owned by defendants. He had no contact with any of defendants' patients. Plaintiff alleged it was not anticipated that he ever would have contact with any of defendants' patients. Defendants offered plaintiff a permanent position with Kaiser. A written contract was prepared. Subsequently, however, plaintiff was advised "that to finish the process of becoming an employee he would need [a] mumps vaccine." Plaintiff could not be vaccinated with the mumps vaccine because it is grown in chicken embryos. To be vaccinated, it was alleged, "would violate [plaintiff's] system of beliefs and would be considered immoral by [him]." When plaintiff refused to be vaccinated with the mumps vaccine, defendants withdrew the employment offer.

## C. *The FEHA and Differing Definitions of Religion*

### 1. *The FEHA*

The elements of a religious creed discrimination claim are that: the plaintiff had a bona fide religious belief; the employer was aware of that belief; and the belief conflicted with an employment requirement. (*Soldinger v. Northwest Airlines, Inc.* (1996) 51 Cal.App.4th 345, 370 [58 Cal.Rptr.2d 747].) With respect to the first element, possession of a bona fide religious belief, section 12940, subdivision (a) states in part: "It shall be an unlawful employment practice . . . [¶] (a) For an employer, because of the . . . religious creed . . . of any person, to refuse to hire or employ the person . . . or to bar or to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Further, section 12940, subdivision (*l*), states in part: "It shall be an unlawful employment practice . . . [¶] . . . [¶] (*l*) For an employer . . . to refuse to hire or employ a person . . . because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer . . . demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance . . . , but is unable to reasonably accommodate the religious belief or observance without undue hardship . . . ."

Definition of the terms "religious belief or observance" and "religious creed" are provided in a statute and in a regulation. Section 12940, subdivision (*l*) defines religious belief as follows: "Religious belief or observance, as used in [section 12940], includes, but is not limited to, observance of a Sabbath or other religious holy day or days, and reasonable time necessary for travel prior and subsequent to a religious observance." Further description of the scope of the religious belief protection in the FEHA is found in section 12926, subdivision (o), which states: "As used in this part in connection with unlawful practices, unless a different meaning clearly appears from the context: [¶] . . . [¶] (o) 'Religious creed,' 'religion,' 'religious observance,' 'religious belief,' and 'creed' include all aspects of religious belief, observance, and practice." The administrative agency charged with enforcing the FEHA, the Fair Employment and Housing Commission, has also enacted a regulation defining "religious creed." California Code of Regulations, title 2, section 7293.1 (regulation 7293.1), defines "religious creed" as follows: " 'Religious creed' includes any traditionally recognized religion as well as beliefs, observations, or practices which an individual sincerely holds and which occupy in his or her life a place of importance parallel to that of traditionally recognized religions." Consistent

with regulation 7293.1, plaintiff argues that his commitment to a vegan lifestyle occupies a place in his life parallel to that of traditionally recognized religions. Regulation 7293.1, by its express terms, reflects the notion that religious creed extends beyond traditionally recognized religions to encompass beliefs, observations, or practices occupying a parallel place of importance "to that of traditionally recognized religions" in an individual's life. As will be discussed later, that concept of religion originates from two United States Supreme Court cases involving conscientious objection to military service—*United States v. Seeger* (1965) 380 U.S. 163, 164-188 [85 S.Ct. 850, 853-855, 13 L.Ed.2d 733], and *Welsh v. United States* (1970) 398 U.S. 333, 335-344 [90 S.Ct. 1792, 1794-1798, 26 L.Ed.2d 308].

■ It is well settled that the interpretation of a statute by an agency charged with its administration is entitled to great weight. (*Woods v. Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032]; *Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].) The administrative interpretation must be consistent with the statute and not in conflict with it. (§ 11342.2; *Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 269 [121 Cal.Rptr.2d 203, 47 P.3d 1069]; *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 82 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) Judicial review is limited to whether the agency reasonably interpreted the legislative mandate and whether the regulation is reasonably necessary to effectuate the purpose of the statute. (*Woods v. Superior Court, supra*, 28 Cal.3d at p. 679; *Morris v. Williams, supra*, 67 Cal.2d at pp. 748-749.) Nevertheless, final responsibility for interpretation of the statute rests with the courts. (*Woods v. Superior Court, supra*, 28 Cal.3d at p. 679; *Morris v. Williams, supra*, 67 Cal.2d at p. 748.)

### 2. *California Decisional Authority*

We have not found any Department of Fair Employment and Housing decision or any California judicial authority construing "religious creed" within the meaning of the FEHA or regulation 7293.1. But California courts have grappled with the question of what constitutes a religion in other contexts. We discuss several of those decisions.

In *Smith v. Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143, 1166 [51 Cal.Rptr.2d 700, 913 P.2d 909], the California Supreme Court, in a plurality opinion authored by Associate Justice Kathryn Mickle Werdegar, observed that a religious belief is something other than "a philosophy or a way of life." Justice Werdegar further noted, " '[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to

merit First Amendment protection.' [Citation.]" (*Id.* at pp. 1167-1168, quoting *Thomas v. Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 714 [101 S.Ct. 1425, 1430, 67 L.Ed.2d 624].) Whether the plaintiff's actions were based on his religious beliefs was not at issue in *Smith.*

In a frequently cited opinion, *Fellowship of Humanity v. Co. Alameda* (1957) 153 Cal.App.2d 673, 677-693 [315 P.2d 394], the Court of Appeal, in an opinion authored by then Presiding Justice Raymond Peters, discussed at length the meaning of "religious worship" in a property tax exemption case. The court framed the question before it as follows: "[W]e will assume that the [trial court's] findings, properly interpreted, are to the effect that the adoration of, and reverence to, a deity have no place in the beliefs of [the Fellowship of Humanity]. That presents the fundamental question—is a belief in God or gods essential to 'religious worship,' as those terms are used in the state Constitution?" (*Id.* at p. 680.) The court noted that early federal cases (*Davis v. Beason* (1890) 133 U.S. 333, 342 [10 S.Ct. 299, 300, 33 L.Ed. 637], overruled on other grounds, *Romer v. Evans* (1996) 517 U.S. 620, 634 [116 S.Ct. 1620, 1623, 134 L.Ed.2d 855]; *Berman v. United States* (9th Cir. 1946) 156 F.2d 377, 380; *George v. United States* (9th Cir. 1952) 196 F.2d 445, 451) had defined religion by reference to a belief in a deity or a Supreme Being. However, Presiding Justice Peters observed: "[T]here are forms of belief generally and commonly accepted as religions and whose adherents . . . practice what is commonly accepted as religious worship, which do not include or require as essential the belief in a deity. Taoism, classic Buddhism, and Confucianism, are among these religions." (*Fellowship of Humanity v. Co. Alameda, supra,* 153 Cal.App.2d at p. 684; accord, *Citizens For Parental Rights v. San Mateo Bd. of Education* (1975) 51 Cal.App.3d 1, 21, fn. 22 [124 Cal.Rptr. 68, 82 A.L.R.3d 544] ["religious liberty is not limited to theistic beliefs"].) Presiding Justice Peters found that dictionary definitions, decisional authority, and the views of scholars were not particularly helpful in resolving the issue before the court. (*Fellowship of Humanity v. Co. Alameda, supra,* 153 Cal.App.2d at pp. 684-691.) Presiding Justice Peters noted that in *United States v. Ballard* (1944) 322 U.S. 78, 86 [64 S.Ct. 882, 886, 88 L.Ed. 1148], the United States Supreme Court established the concept that "the state has no power to decide the validity of the beliefs held by the group involved." (*Fellowship of Humanity v. Co. Alameda, supra,* 153 Cal.App.2d at p. 692.) Presiding Justice Peters then reasoned: "[T]he only [proper] inquiry . . . is the objective one of whether or not the belief occupies the same place in the lives of its holders that the orthodox beliefs occupy in the lives of believing majorities, and whether a given group that claims the exemption conducts itself the way groups conceded to be religious conduct themselves. The content of the belief,

under such test, is not a matter of governmental concern. [¶] Under this test the belief or nonbelief in a Supreme Being is a false factor. The only way the state can determine the existence or nonexistence of 'religious worship' is to approach the problem objectively. It is not permitted to test validity of, or to compare beliefs. This simply means that 'religion' fills a void that exists in the lives of most men. Regardless of why a particular belief suffices, as long as it serves this purpose, it must be accorded the same status of an orthodox religious belief." (*Id.* at pp. 692-693; see *Saint Germain Foundation v. County of Siskiyou* (1963) 212 Cal.App.2d 911, 916 [28 Cal.Rptr. 393].) ▌ Presiding Justice Peters concluded: "[T]he proper interpretation of the terms 'religion' or 'religious' in tax exemption laws should not include any reference to whether the beliefs involved are theistic or nontheistic. Religion simply includes: (1) a belief, not necessarily referring to supernatural powers; (2) a cult, involving a gregarious association openly expressing the belief; (3) a system of moral practice directly resulting from an adherence to the belief; and (4) an organization within the cult designed to observe the tenets of belief." (*Fellowship of Humanity v. Co. Alameda, supra,* 153 Cal.App.2d at p. 693.)

In *Young Life Campaign v. Patino* (1981) 122 Cal.App.3d 559, 561 [176 Cal.Rptr. 23], the Court of Appeal for the Third Appellate District considered whether an organization was a "church" within the meaning of the Unemployment Insurance Code. The court adopted an approach used by the Internal Revenue Service to determine what is a "church," which the Court of Appeal described as follows: "Rather than defining 'church,' the IRS admits its inability to formulate a definition, and applies criteria derived from the forms and practices observed in recognized churches, without giving controlling weight to any. [Citation.]" (*Id.* at pp. 574-575, fn. omitted.) The criteria for defining a church applied by the Internal Revenue Service were set forth in a footnote and included: " '(1) a distinct legal existence, (2) a recognized creed and form of worship, (3) a definite and distinct ecclesiastical government, (4) a formal code of doctrine and discipline, (5) a distinct religious history, (6) a membership not associated with any other church or denomination, (7) a complete organization of ordained ministers ministering to their congregants, (8) ordained ministers selected after completing prescribed courses of study, (9) a literature of its own, (10) established places of worship, (11) regular congregations, (12) regular religious services, (13) Sunday schools for the religious instruction of the young, (14) schools for the preparation of its ministers.' " (*Id.* at p. 574, fn. 15.) The Court of Appeal observed: "A similar approach to the meaning of 'religion' was recently taken in an illuminating law review note: 'Religion can be described and exemplified in ways that disclose "a complicated

network of similarities overlapping and criss crossing." Unraveled, the various strands do not amount to "religion" for the meaning of the network resides in the interweaving itself. Thus, it is exemplary and not exhaustive to say that religion involves traditional theistic beliefs, or belief in something parallel to an orthodox conception of God, or an ultimate concern, or a set of beliefs that "address themselves to basic questions about the nature of reality and the meaning of human existence." A non-analytic understanding of religion is not boundless, for the network of similarities always includes a binding of the individual to something unrelated to individuality, through the intense operation of faith. No one element or set of elements constitutes a necessary and sufficient condition for religion; presence or absence of an element can neither establish a religion, nor prevent a belief from becoming a religion.' [Fns. omitted.] (Note, *'Mind Control' or Intensity of Faith: The Constitutional Protection of Religious Beliefs* (1978) 13 Harv.Civ.Rights—Civ.Lib.L.Rev. 751, 760-761.)" (*Young Life Campaign v. Patino, supra,* 122 Cal.App.3d at p. 575, fn. 17, fns. omitted.)

These California decisions point away from a strictly theistic definition of religion. A belief in a Supreme Being is not required. (*Saint Germain Foundation v. County of Siskiyou, supra,* 212 Cal.App.2d at p. 916; *Fellowship of Humanity v. Co. Alameda, supra,* 153 Cal.App.2d at p. 692.) But, something more than a philosophy or way of life is required. (*Smith v. Fair Employment & Housing Com., supra,* 12 Cal.4th at p. 1166.) Moreover, as discussed by then Presiding Justice Peters, the inquiry is "a purely objective one." (*Fellowship of Humanity v. Co. Alameda, supra,* 153 Cal.App.2d at p. 692.) Among the factors to be considered are whether the belief system occupies in a person's life a place *parallel* to that of God in recognized religions and whether it addresses ultimate concerns thereby filling a void in the individual's life. (*Id.* at p. 693.) Notably, in considering the concept of religion, California courts have consistently looked to federal authority. In accordance with that practice, we turn to federal decisions defining religion in varying constitutional, statutory, and regulatory contexts.

### 3. United States Supreme Court Cases

#### a. The original theistic view of religion and the development of a broader perspective

Historically, the United States Supreme Court at first adopted a theistic definition of religion. In the 19th century, for example, in *Davis v. Beason, supra,* 133 U.S. at page 342 [10 S.Ct. at page 300], the court stated: "The term 'religion' has reference to one's views of his relations to his Creator,

and to the obligations they impose of reverence for his being and character, and of obedience to his will." (See also *United States v. Macintosh* (1931) 283 U.S. 605, 633-634 [51 S.Ct. 570, 578-579, 75 L.Ed. 1302] (dis. opn. of Hughes, C. J.), overruled, *Girouard v. United States* (1946) 328 U.S. 61, 69 [66 S.Ct. 826, 829-830, 90 L.Ed. 1084].) Later, however, the United States Supreme Court took a more expansive view of religion. In *Torcaso v. Watkins* (1961) 367 U.S. 488, 495 [81 S.Ct. 1680, 1683-1684, 6 L.Ed.2d 982], for example, the court noted that neither a state nor the federal government can constitutionally "aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." In a footnote the court observed, "Among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and others." (*Id.* at p. 495, fn. 11 [81 S.Ct. at p. 1684].)

### b. *United States v. Seeger*

As noted above, the concept of religion reflected in regulation 7293.1 is derived in part from language in two United States Supreme Court cases construing statutory language—"religious training and belief"—in the context of conscientious objection to military service. The legal dispute before the Supreme Court in *Seeger,* decided in 1965, was as follows, "These cases involve claims of conscientious objectors under [section] 6(j) of the Universal Military Training and Service Act, 50 U.S.C.App. [section] 456(j) (1958 ed.), which exempts from combatant training and service in the armed forces of the United States those persons who by reason of their religious training and belief are conscientiously opposed to participation in war in any form." (*United States v. Seeger, supra,* 380 U.S. at pp. 164-165 [85 S.Ct. at p. 853].) Section 6(j) of the statute in question defined "religious training and belief" as " 'an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but [not including] essentially political, sociological, or philosophical views or a merely personal moral code.' " (*Id.* at p. 165 [85 S.Ct. at pp. 853-854].) The *Seeger* court framed the dispositive question before it as follows: "Our question . . . is the narrow one: Does the term 'Supreme Being' as used in [section] 6(j) mean the orthodox God or the broader concept of a power or being, or a faith, 'to which all else is subordinate or upon which all else is ultimately dependent'? Webster's New International Dictionary (Second Edition.)" (*Id.* at p. 174 [85 S.Ct. at p. 858].) The court emphasized, "In considering this question we resolve it *solely* in relation to the language of [section] 6(j) and not otherwise." (*Ibid.,* italics added.)

The Supreme Court held, "Congress, in using the expression 'Supreme Being' rather than the designation 'God,' was merely clarifying the meaning

of religious training and belief so as to embrace all religions and to exclude essentially political, sociological, or philosophical views." (*United States v. Seeger, supra,* 380 U.S. at p. 165 [85 S.Ct. at p. 854].) The Supreme Court stated: "We believe that under this construction, the test of belief 'in a relation to a Supreme Being' is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption. Where such beliefs have parallel positions in the lives of their respective holders we cannot say that one is 'in a relation to a Supreme Being' and the other is not." (*Id.* at pp. 165-166 [85 S.Ct. at p. 854].) In other words, the court refused to give preference to those who believe in a conventional God as opposed to those who do not. (*United States v. Seeger, supra,* 380 U.S. at p. 175 [85 S.Ct. at pp. 858-859]; *Welsh v. United States, supra,* 398 U.S. at p. 338 [90 S.Ct. at pp. 1795-1796].)

In *Seeger,* the court concluded Congress intended that to qualify as a conscientious objector, a person needed only to "have a conviction based upon religious training and belief . . . ." (*United States v. Seeger, supra,* 380 U.S. at p. 176 [85 S.Ct. at p. 859].) The court construed that phrase as follows: "Within that phrase would come all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent. The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory defini-tion." (*Ibid.*) The Supreme Court concluded, "This construction avoids imputing to Congress an intent to classify different religious beliefs, exempt-ing some and excluding others, and is in accord with the well-established congressional policy of equal treatment for those whose opposition to ser-vice is grounded in their religious tenets." (*Ibid.*)

The United States Supreme Court recognized "the difficulties that have always faced the trier of fact in these cases." (*United States v. Seeger, supra,* 380 U.S. at p. 183 [85 S.Ct. at p. 863].) It described the proper test as "essentially objective" and described it as follows, "[N]amely, does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemp-tion?" (*Id.* at p. 184 [85 S.Ct. at p. 863].) The court further noted that the task before "[l]ocal [Selective Service] boards and courts" is not to reject incomprehensible beliefs, but "to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious." (*Id.* at pp. 184-185 [85 S.Ct. at p. 863].)

In *Seeger*, the court held that a potential draftee who could not definitively declare that he believed in a Supreme Being, but who strongly concluded, with the strength of a more traditional religious conviction, that killing in war was wrong, immoral, and unethical, qualified as a conscientious objector. The court stated: "In summary, Seeger professed 'religious belief' and 'religious faith.' He did not disavow any belief 'in a relation to a Supreme Being'; indeed he stated that 'the cosmic order does, perhaps, suggest a creative intelligence.' He decried the tremendous 'spiritual' price man must pay for his willingness to destroy human life. In light of his beliefs and the unquestioned sincerity with which he held them, we think the Board, had it applied the test we propose today, would have granted him the exemption. We think it clear that the beliefs which prompted his objection occupy the same place in his life as the belief in a traditional deity hold in the lives of his friends, the Quakers." (*United States v. Seeger, supra,* 380 U.S. at p. 187 [85 S.Ct. at pp. 864-865].) The Supreme Court reached a similar conclusion as to the two other potential inductees.

### c.   *Welsh v. United States*

Section 6(j) of the Universal Military Training and Service Act was again discussed by the United States Supreme Court in 1970, in *Welsh v. United States, supra,* 398 U.S. at pages 338-344 [90 S.Ct. at pages 1795-1799]. The *Welsh* court elaborated on *Seeger* as follows: "The [*Seeger*] Court's principal statement of its test for determining whether a conscientious objector's beliefs are religious within the meaning of [section] 6 (j) was as follows: [¶] 'The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition.' 380 U.S., at 176 [85 S.Ct. at p. 859]. [¶] The [*Seeger*] Court made it clear that these sincere and meaningful beliefs that prompt the registrant's objection to all wars need not be confined in either source or content to traditional or parochial concepts or religion. It held that [section] 6 (j) 'does not distinguish between externally and internally derived beliefs,' *id.,* at 186, [85 S.Ct. at p. 864] and also held that 'intensely personal' convictions which some might find 'incomprehensible' or 'incorrect' come within the meaning of 'religious belief' in the Act. *Id.,* at 184-185 [85 S.Ct. at pp. 863-864]. What is necessary under *Seeger* for a registrant's conscientious objection to all war to be 'religious' within the meaning of [section] 6 (j) is that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions. Most of the great religions of today and of the past have embodied the idea of a Supreme

Being or a Supreme Reality—a God—who communicates to man in some way a consciousness of what is right and should be done, of what is wrong and therefore should be shunned. If an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons. Because his beliefs function as a religion in his life, such an individual is as much entitled to a 'religious' conscientious objector exemption under [section] 6(j) as is someone who derives his conscientious opposition to war from traditional religious convictions." (*Welsh v. United States, supra,* 398 U.S. at pp. 339-340 [90 S.Ct. at p. 1796].)

In *Welsh,* the United States Supreme Court also discussed the federal statute's exclusion of persons with " 'essentially political, sociological, or philosophical views or a merely personal moral code' " from conscientious objector status. (*Welsh v. United States, supra,* 398 U.S. at pp. 342-343 [90 S.Ct. at p. 1798].) The court held: "We certainly do not think that [section] 60 (j)'s exclusion . . . should be read to exclude those who hold strong beliefs about our domestic and foreign affairs or even those whose conscientious objection to participation in all wars is founded to a substantial extent upon considerations of public policy. The two groups of registrants that obviously do fall within these exclusions from the exemption are those whose beliefs are not deeply held and those whose objection to war does not rest at all upon moral, ethical, or religious principle but instead rests solely upon considerations of policy, pragmatism, or expediency." (*Ibid.*) The court concluded that section 6(j) "exempts from military service all those whose consciences, spurred by deeply held moral, ethical, or religious beliefs, would give them no rest or peace if they allowed themselves to become a part of an instrument of war." (*Welsh,* at p. 344 [90 S.Ct. at p. 1798].)

The United States Supreme Court reversed the judgment convicting the defendant of refusing to submit to induction into the military. (*Welsh v. United States, supra,* 398 U.S. at p. 344 [90 S.Ct. at pp. 1798-1799].) The defendant in *Welsh,* like the one in *Seeger,* could not definitively affirm or deny a belief in a Supreme Being. The defendant in *Welsh,* like the potential draftee in *Seeger,* preferred to leave that question open. But, as the United States Supreme Court explained: "[B]oth Seeger and Welsh affirmed on [their] applications [for conscientious objector status] that they held deep conscientious scruples against taking part in wars where people were killed. Both strongly believed that killing in war was wrong, unethical, and immoral, and their consciences forbade them to take part in such an evil

practice. Their objection to participating in war in any form could not be said to come from a 'still, small voice of conscience'; rather, for them that voice was so loud and insistent that both men preferred to go to jail rather than serve in the Armed Forces. There was never any question about the sincerity and depth of Seeger's convictions as a conscientious objector, and the same is true of Welsh. In this regard the Court of Appeals noted, '[t]he government concedes that [Welsh's] beliefs are held with the strength of more traditional religious convictions.' [Citation.]" (*Id.* at p. 337 [90 S.Ct. at p. 1795].)

### d.   *Wisconsin v. Yoder*

In 1972, the United States Supreme Court presented a different perspective than it had in the conscientious objector cases discussed above when it decided *Wisconsin v. Yoder* (1972) 406 U.S. 205, 215-216 [92 S.Ct. 1526, 1533-1534, 32 L.Ed.2d 15] (plur. opn. of Burger, C. J.). At issue in *Yoder* was whether Amish parents' objections to sending their children to public school beyond eighth grade were premised simply on a way of life or were rooted in religious belief. (*Id.* at p. 215 [92 S.Ct. at p. 1533].) In his plurality opinion, Chief Justice Warren Burger explained: "In evaluating [these free exercise of religion claims] we must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. *A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief.* Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. *Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis.* Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clause." (*Id.* at pp. 215-216 [92 S.Ct. at p. 1533], italics added, fn. omitted.) The plurality then found based on the record: "[T]he traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living. That the Old Order Amish daily life and religious practice stem from their faith is shown by the fact that it is in response to [a] Biblical injunction

. . . . As the expert witnesses explained, the Old Order Amish religion pervades and determines virtually their entire way of life, regulating it with detail of the Talmudic diet through the strictly enforced rules of the church community." (*Id.* at p. 216 [92 S.Ct. at pp. 1533-1534].) Associate Justice Lewis Powell's concurring opinion concluded religion was the motivating force for the parents' decision not to send their children to public high schools. (*Id.* at pp. 236-237 [92 S.Ct. at pp. 1543-1544] (conc. opn. of Powell, J.).) As can be noted, the *Yoder* plurality distinguished those beliefs which are entitled to constitutional free exercise clause protection from viewpoints "based on purely secular considerations" or a "subjective evaluation and rejection of the contemporary secular values . . . ." (*Id.* at pp. 215-216 [92 S.Ct. at p. 1533].)

### 4. *Federal Employment Discrimination Law*

#### a. *Statutory and regulatory authority*

Title VII of the Civil Rights Act of 1964 (title VII) makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." (42 U.S.C. § 2000e-2(a)(1).) Title VII was amended in 1972 to include a definition of religion. (42 U.S.C. § 2000e(j); *Trans World Airlines, Inc. v. Hardison* (1977) 432 U.S. 63, 73 [97 S.Ct. 2264, 2271, 53 L.Ed.2d 113].) As amended, the pertinent part of title VII defines religion as follows: "The term 'religion' includes all aspects of religious observance and practice, as well as belief . . . ." (42 U.S.C. § 2000e(j).) The United States Supreme Court has held, "The intent and effect of this definition was to make it an unlawful employment practice under [title VII] for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." (*Trans World Airlines, Inc. v. Hardison, supra,* 432 U.S. at p. 74 [97 S.Ct. at pp. 2271-2272]; see *Balint v. Carson City, Nev.* (9th Cir. 1999) 180 F.3d 1047, 1052.)

Federal law governing "religious practices" discrimination in the employment context is drawn from the United States Supreme Court decisions in *Seeger* and *Welsh*. The applicable Equal Employment Opportunity Commission (EEOC) guideline states: " 'Religious' nature of a practice or belief. [¶] In most cases whether or not a practice or belief is religious is not at issue. However, in those cases in which the issue does exist, the [Equal Employment Opportunity] Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely

held with the strength of traditional religious views. This standard was developed in *United States v. Seeger*, [*supra*,] 380 U.S. 163 . . . and *Welsh v. United States*, [*supra*,] 398 U.S. 333 . . . . The Commission has consistently applied this standard in its decisions. The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee. . . ." (29 C.F.R. § 1605.1 (2002), fn. omitted.)

An example of the EEOC's administrative construction of the term religion is found in its decision in *LaViolette v. Daley*, appeal No. 01A01748, <http://www.eeoc.gov/decisions/01A01748.txt> (as of Sept. 13, 2002). The claimant alleged the Department of Commerce had retaliated against him "because of his unconventional beliefs about cold fusion and other technologies[.]" (*Ibid.*) The claimant argued, " '[D]iscrimination against a person on account of his beliefs is the essence of discrimination on the basis of religion . . . .' " (*Ibid.*) Noting that an agency is required to accept a complaint from an employee who believes he or she had been retaliated against in violation of title VII, the EEOC held: " 'In determining which beliefs are protected under Title VII, the Supreme Court has held that the test is whether the belief professed by a complainant is sincerely held and whether it is, in his own scheme of things, religious.' *Akers v. Department of Transportation,* EEOC Appeal No. 01932415 (May 25, 1993), citing *Welsh v. United States,* [*supra*,] 398 U.S. 333 . . . . Moreover, in defining religious beliefs, our guidelines note that 'the fact that no religious group espouses such beliefs . . . will not determine whether the belief is a religious belief of the employee . . . .' 29 C.F.R. § 1605.1. [¶] In the instant case, complainant argues that his unconventional beliefs about cold fusion and other technologies should be viewed as a religion and therefore protected. Complainant claims he was terminated and denied the opportunity to be rehired because of religion, which embodies his cold fusion beliefs. Therefore, under applicable law noted above, we find that the agency improperly dismissed complainant's claim of discrimination for failure to state a claim." (*LaViolette v. Daley, supra,* No. 01A01748.) The EEOC regulation states that the standard adopted therein "was developed in" *Seeger* and *Welsh*. (29 C.F.R. § 1605.1 (2002).) We will discuss the EEOC construction of the federal regulatory guidelines and its relationship to *Seeger, Welsh,* and California's regulation 7293.1 later.

### b. *Federal decisional authority*

Federal decisional authority generally involves construction of the religious freedom protections in title VII in two contexts. The first involves the

application of religious freedom provisions of title VII in cases where a plaintiff is a member of a traditional religious group. The second context involves the application of the title VII religious freedom protections to nontraditional religious organizations.

### i. *Traditional religious organizations*

In *E.E.O.C. v. Union Independiente De La Autoridad* (1st Cir. 2002) 279 F.3d 49, 55-56, the United States Court of Appeals for the First Circuit considered whether a member of the Seventh-Day Adventist Church had a religious belief that prohibited his joining a labor union. The court held: "The requirement that the employee have a 'bona fide religious belief' is an essential element of a religious accommodation claim. Title VII does not mandate an employer or labor organization to accommodate what amounts to a 'purely personal preference.' *Vetter v. Farmland Indus., Inc.*, 120 F.3d 749, 751 (8th Cir. 1997). In order to satisfy this element, the plaintiff must demonstrate both that the belief or practice is religious and that it is sincerely held. *See Redmond v. GAF Corp.*, 574 F.2d 897, 901[,] n. 12 (7th Cir. 1978); *cf. also Hager v. Sec. of Air Force*, 938 F.2d 1449, 1454 (1st Cir. 1991) (noting similar test for determining whether applicant is entitled to an exemption from military service as a conscientious objector). [¶] As noted above, Title VII's capacious definition of 'religion' includes 'all aspects of religious observance and practice, as well as belief . . . .' 42 U.S.C. § 2000e(j); *see also* 29 C.F.R. § 1605.1 ('[R]eligious practices . . . include moral and ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.') Religious beliefs protected by Title VII need not be 'acceptable, logical, consistent, or comprehensible to others . . . .' *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, [*supra*,] 450 U.S. 707, 714 [101 S.Ct. 1425, 1430] . . . . The statute thus leaves little room for a party to challenge the religious nature of an employee's professed beliefs. Plus, in this case, the religious foundation of the Seventh-Day Adventist faith's opposition to union membership has long been recognized in the opinions of this court and those of our sister circuits. [Citations.] The religious nature of Cruz's professed belief therefore cannot seriously be disputed, nor has [the union] mounted such a challenge." (*E.E.O.C. v. Union Independiente De La Autoridad, supra*, 279 F.3d at pp. 55-56; see also *Seshadri v. Kasraian* (7th Cir. 1997) 130 F.3d 798, 800 ["It is true that the EEOC, following [*Seeger*], does not think that the plaintiff in a case of religious discrimination must be a member of an authorized church or subscribe to its full menu of orthodox beliefs. 29 C.F.R. § 1605.1. We agree."]; *Redmond v. GAF Corp., supra*, 574 F.2d at p. 901, fn. 12 ["is the 'belief' for which protection is sought 'religious' in

[the] person's own scheme of things, and . . . is it 'sincerely held' "]; *Cooper v. General Dynamics Convair Aerospace Div.* (5th Cir. 1976) 533 F.2d 163, 168 ["the definition is what may be termed an operative one: all forms and aspects of religion, however eccentric, are protected" (italics omitted)].)

ii. *Nontraditional religious organizations*

Title VII has also been applied to members of nontraditional religious organizations. An example of the application of title VII to a more non-traditional organization was discussed in *Peterson v. Wilmur Communications, Inc.* (E.D.Wis. 2002) 205 F.Supp.2d 1014, 1018-1019. The United States District Court explained as follows: "[A] test has emerged to deter-mine whether beliefs are a religion for purposes of Title VII. Rather than define religion according to its content, the test requires courts take a functional approach and ask whether a belief 'functions as' religion in the life of the individual before the court. *See Redmond v. GAF Corp.*, [*supra*,] 574 F.2d 897, 901 n. 12 . . . (citing *United States v. Seeger*, [*supra*,] 380 U.S. 163 . . . and *Welsh v. United States*, [*supra*,] 398 U.S. 333 . . . and stating that they supply the test for determining what is a 'religion' under Title VII); 29 C.F.R. § 1605.1 (same). Stated another way, the court should find beliefs to be a religion if they 'occupy the same place in the life of the [individual] as an orthodox belief in God holds in the life of one clearly qualified.' *Seeger*, 380 U.S. at 184 [85 S.Ct. at p. 863]. To satisfy this test, the plaintiff must show that the belief at issue is ' "sincerely held" ' and ' "religious" in [his or her] own scheme of things.' *Redmond*, 574 F.3d at 901 n. 12 (quoting *Seeger*, 380 U.S. at 185 [85 S.Ct. at pp. 863-864]). In evaluating whether a belief meets this test, courts must give ' "great weight" ' to the plaintiff's own characterization of his or her beliefs as religious. *Seeger*, 380 U.S. at 184 [85 S.Ct. at p. 863]. [¶] . . . Purely 'moral and ethical beliefs' can be religious 'so long as they are held with the strength of religious convictions.' *Welsh*, 398 U.S. at 339-40 [90 S.Ct. at pp. 1796-1797] . . . . [¶] . . . So long as the belief is sincerely held and is religious in the plaintiff's scheme of things, the belief is religious regardless of whether it is 'acceptable, logical, consistent, or comprehensible to others.' *Thomas*, 450 U.S. at 714 [101 S.Ct. at p. 1430]." (*Peterson v. Wilmur Communications, Inc., supra,* 205 F.Supp.2d at pp. 1018-1019.)

In *Peterson,* the United States District Court for the Eastern District of Wisconsin held, on a summary judgment motion, that the World Church of the Creator, a central tenet of which was white supremacy, was a religion within the meaning of title VII. (*Peterson v. Wilmur Communications, Inc.,*

*supra,* 205 F.Supp.2d at pp. 1021-1023.) The plaintiff sincerely believed in the teachings of the church. He considered his beliefs religious and considered the church his religion. The teachings of the church played a central role in the plaintiff's life. He had been a minister of the church for more than three years. He worked at putting the church's teachings into everyday practice. The federal district court judge concluded: "[A]ll the evidence conclusively reveals that the teachings of [the church] are 'religious' in plaintiff's 'own scheme of things.' These beliefs occupy for plaintiff a place in his life parallel to that held by a belief in God for believers in more mainstream theistic religions. Thus, [the church] 'functions as' religion for plaintiff." (*Id.* at pp. 1021-1022.) As can be noted, federal courts in construing the title VII religious freedom provision broadly construe the term religion. As will be noted, we do not believe regulation 7293.1 can be so broadly construed.

### 5. *Other federal religion cases*

In contexts other than employment, in the last 23 years, the federal courts have articulated a less expansive definition of religion or religious creed than that in title 29 Code of Federal Regulations section 1605.1 (2002) as administratively construed. The key federal cases are discussed below.

#### a. *The Concurring Opinion in Malnak v. Yogi*

Beginning in 1979, with the filing of the concurring opinion of Third Circuit Court of Appeals Judge Arlin M. Adams, the federal courts began defining religion in a slightly different fashion than that in *Seeger* and *Welsh,* which were construing section 6(j) of the Universal Military Training and Service Act. Judge Adams's concurring opinion was later adopted by the Third, Eighth, Ninth, and Tenth Circuit Courts of Appeals. The question before the court of appeals in *Malnak v. Yogi* (3d Cir. 1979) 592 F.2d 197, 198, as posited in the *per curiam* decision, was as follows: "This appeal requires us to decide whether the district court erred in determining that the teaching of a course called the Science of Creative Intelligence Transcendental Meditation (SCI/TM) in the New Jersey public high schools . . . constituted an establishment of religion in violation of the first amendment of the United States Constitution." The court of appeals, in a *per curiam* opinion, affirmed the district court's judgment.

Circuit Judge Adams filed a lengthy concurring opinion in which he proposed a modern definition of religion based on three indicia. (*Malnak v. Yogi, supra,* 592 F.2d at pp. 207-210.) Judge Adams stated the question presented as "whether a particular belief-system should be considered a

religion for first amendment purposes," and asked, "how far the constitutional definition of religion extends beyond Theistic formulation . . . ." (*Id.* at p. 203.) In an attempt to determine when a belief "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption" (*United States v. Seeger, supra,* 380 U.S. at p. 166 [85 S.Ct. at p. 854]), Judge Adams identified three indicia of religion. Judge Adams identified the first prong of the religion test as follows: "The first and most important of these indicia is the nature of the ideas in question. This means that a court must, at least to a degree, examine the content of the supposed religion, not to determine its truth or falsity, or whether it is schismatic or orthodox, but to determine whether the subject matter it comprehends is consistent with the assertion that it is, or is not, a religion." (*Malnak,* at p. 208, fn. omitted.) The second test was identified by Judge Adams as follows: "Thus, the 'ultimate' nature of the ideas presented is the most important and convincing evidence that they should be treated as religious. Certain isolated answers to 'ultimate' questions, however, are not necessarily 'religious' answers, because they lack the element of comprehensiveness, the second of the three indicia. A religion is not generally confined to one question or one moral teaching; it has a broader scope. It lays claim to an ultimate and comprehensive 'truth.' " (*Id.* at pp. 208-209, fn. omitted.) The final criteria was described by Judge Adams was follows: "A third element to consider in ascertaining whether a set of ideas should be classified as a religion is any formal, external, or surface signs that may be analogized to accepted religions. Such signs might include formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observation of holidays and other similar manifestations associated with the traditional religions. Of course, a religion may exist without any of these signs, so they are not determinative, at least by their absence, in resolving a question of definition. But they can be helpful in supporting a conclusion of religious status given the important role such ceremonies play in religious life." (*Id.* at p. 209, fns. omitted.)

Although Judge Adams's analysis only appeared in a concurring opinion, his discussion immediately began to find direct as well as indirect acceptance with other federal appellate court decisions. (E.g., *DeHart v. Horn* (3d Cir. 2000) 227 F.d 47, 52, fn. 3; *Love v. Reed* (8th Cir. 2000) 216 F.3d 682, 687 [adopting analysis based on Third Circuit ruling premised entirely on Judge Adams's concurring opinion in *Malnak*]; *U.S. v. Meyers* (10th Cir. 1996) 95 F.3d 1475, 1483 [analyzing religion issue using in part a Third Circuit ruling premised upon Judge Adams's *Malnak* concurring opinion]; *Alvarado v. City of San Jose* (9th Cir. 1996) 94 F.3d 1223, 1227; *Dettmer v. Landon* (4th Cir. 1986) 799 F.2d 929, 931; *Grove v. Mead School Distr. No.*

*344* (9th Cir. 1985) 753 F.2d 1528, 1534; *Wiggins v. Sargent* (8th Cir. 1985) 753 F.2d 663, 666 [adopting Third Circuit test]; *Africa v. Com. of Pa.* (3d Cir. 1981) 662 F.2d 1025, 1033-1034.) Similarly, district court judges have relied upon Judge Adams's concurring opinion in whole or in part. (*Mitchell v. Angelone* (E.D.Va. 1999) 82 F.Supp.2d 485, 492; *Altman v. Bedford Cent. School Dist.* (S.D.N.Y. 1999) 45 F.Supp.2d 368, 378, affd. in part, vacated in part, & revd. in part on other grounds (2d Cir. 2001) 245 F.3d 49; *U.S. v. Meyers* (D.Wyo. 1995) 906 F.Supp. 1494, 1503, affd. (10th Cir. 1996) 95 F.3d 1475; *Church of Scientology v. City of Clearwater* (M.D. Fla. 1991) 756 F.Supp. 1498, 1509-1510, affd. in part, vacated in part, & revd. in part on other grounds (11th Cir. 1993) 2 F.3d 1514; *May v. Cooperman* (D.N.J. 1983) 572 F.Supp. 1561, 1568-1569, affd. (3d Cir. 1985) 780 F.2d 240; *Jacques v. Hilton* (D.N.J. 1983) 569 F.Supp. 730, 733, affd. (3d Cir. 1984) 738 F.2d 422; *Church of the Chosen People, etc. v. United States* (D.Minn. 1982) 548 F.Supp. 1247, 1252-1253; *Van Schaick v. Church of Scientology of Cal., Inc.* (D.Mass. 1982) 535 F.Supp. 1125, 1144; *Africa v. State of Pa.* (E.D.Pa. 1981) 520 F.Supp. 967, 970, affd. (3d Cir. 1981) 662 F.2d 1025.) Similarly, state courts have utilized directly or indirectly the analysis in *Malnak*. (*Needham Pastoral Counseling Center v. Board of Appeals of Needham* (1990) 29 Mass.App. 31 [557 N.E.2d 43, 45]; *Christofferson v. Church of Scientology* (1982) 57 Or.App. 203 [644 P.2d 577, 601 40 A.L.R.4th 1017].) We have found no court which has explicitly or implicitly rejected Judge Adams's views expressed in his 1979 concurring opinion in *Malnak*. Commentators have recognized Judge Adams's opinion as the most influential judicial opinion in the past several decades in terms of defining religion. (See Note, *The Concept of Religion* (1997) 107 Yale L.J. 791, 799; Note, *Constitutional "Religion" A Survey of First Amendment Definitions of Religion* (Summer 2001) Tex. F. on Civ. Liberties & Civ. Rts. 117, 139-144; Feofanov, *Defining Religion: An Immodest Proposal* (Winter 1994) 23 Hofstra L.Rev. 309, 375-377.)

### b.   *Africa v. Com. of Pa.*

In *Africa v. Com. of Pa., supra,* 662 F.2d at pages 1032-1035, the Third Circuit squarely confronted the question of whether a requirement imposed by a group that only raw foods be ingested by its members was entitled to the protection of a religion under the First Amendment. In *Africa,* a prisoner claimed it would violate the tenets of his religion—the MOVE organization—to eat anything other than raw foods. The plaintiff's claim was premised on the free exercise clause of the First Amendment to the United States Constitution. In *Africa,* unlike *Malnak,* where he wrote only a concurring opinion, the unanimous decision was written by Judge Adams. As will

be noted, he relied on his concurring opinion in *Malnak*. The court of appeals first observed: "A court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature, in the claimant's scheme of things. *United States v. Seeger*, [*supra*,] 380 U.S. 163, 185 [85 S.Ct. 850, 863-864]; *Callahan v. Woods*, 658 F.2d 679 (9th Cir. Oct. 5, 1981)." (*Africa v. Com. of Pa., supra*, 662 F.2d at p. 1030.) The court found the plaintiff's beliefs were sincerely held. (*Id.* at pp. 1030-1031.) The Third Circuit panel concluded, however, that the MOVE organization did not satisfy "the 'ultimate' ideas" (*id.* at p. 1033), comprehensiveness, or structural characteristics criteria. (*Id.* at p. 1035.) With respect to the ultimate concerns criterion, speaking for his two colleagues, Judge Adams explained: "Save for its preoccupation with living in accord with the dictates of nature, MOVE makes no mention of, much less places any emphasis upon, what might be classified as a fundamental concern. MOVE does not claim to be theistic: indeed it recognizes no Supreme Being and refers to no transcendental or all-controlling force. Moreover, unlike other recognized religions, with which it is to be compared for first amendment purposes, MOVE does not appear to take a position with respect to matters of personal morality, human mortality, or the meaning and purpose of life. The organization, for example, has no functional equivalent of the Ten Commandments, the New Testament Gospels, the Muslim Koran, Hinduism's Veda, or Transcendental Meditation's Science of Creative Intelligence. Africa insists that he has discovered a desirable way to conduct his life; he does not contend, however, that his regimen is somehow morally necessary or required. Given this lack of commitment to overarching principles, the MOVE philosophy is not sufficiently analogous to more 'traditional' theologies." (*Id.* at p. 1033, italics omitted.)

The *Africa* court explained further why the plaintiff's beliefs were not religious. The Third Circuit Court of Appeals held: "Despite having concluded that MOVE does not deal with 'ultimate ideas,' we concede that the matter is not wholly free from doubt. Appointed counsel for Africa argues that MOVE members do share a fundamental concern, namely, an all-consuming belief in a 'natural' or 'generating' way of life—a way of life that ultimately cannot be reconciled with 'civilization' itself. According to counsel, Africa's insistence on keeping 'in touch with life's vibration' amounts to a form of pantheism, wherein 'the entity of God is the world itself, and God is "swallowed up in that unity which may be designated 'nature'" . . . . [MOVE's] return to nature is not simply a "preferred" state. It is the only state. It is the state of being in pure harmony with nature. This, MOVE calls godly. This is pantheism.' [Citation.] We decline to accept such a characterization of Africa's views, however. We recognize that, under

certain circumstances, a pantheistic-based philosophy might qualify for protection under the free exercise clause. From the record in this case, though, we are not persuaded that Africa is an adherent of pantheism, as that word is commonly defined. His mindset seems to be far more the product of a secular philosophy than of a religious orientation. His concerns appear personal (e.g., he contends that a raw food diet is 'healthy' and that pollution and other such products are 'hazardous') and social (e.g., he claims that MOVE is a 'revolutionary' organization, 'absolutely opposed to all that is wrong' and unable to accept existing regimes), rather than spiritual or other-worldly. Indeed, if Africa's statements are deemed sufficient to describe a religion under the Constitution, it might well be necessary to extend first amendment protection to a host of individuals and organizations who espouse personal and secular ideologies, however much those ideologies appear dissimilar to traditional religious dogmas." (*Africa v. Com. of Pa., supra,* 662 F.2d at pp. 1033-1034, fns. & italics omitted.)

The *Africa* court further noted: "The Supreme Court would appear to have foreclosed such an expansive interpretation of the free exercise clause. In *Wisconsin v. Yoder,* the Court concluded that Wisconsin could not require members of the Amish sect to send their children to school beyond the eighth grade, where there was uncontested evidence that such a course was inconsistent with the Amish religion. The Court arrived at this result only after conducting a searching inquiry into the history and customs of the Amish people and into the nature of their religious teachings and practices. In the course of his opinion for the Court, Chief Justice Burger stressed that the objections of the Amish to compulsory secondary education derived from 'deep religious conviction(s)' rather than from a 'personal' or 'secular' philosophy." (*Africa v. Com. of Pa., supra,* 662 F.2d at p. 1034.)

The *Africa* court concluded: "[I]t is crucial to realize that the free exercise clause does not protect all deeply held beliefs, however 'ultimate' their ends or all-consuming their means. An individual or group may adhere to and profess certain political, economic, or social doctrines, perhaps quite passionately. The first amendment, though, has not been construed, at least as yet, to shelter strongly held ideologies of such a nature, however all-encompassing their scope. As the Supreme Court declared in *Yoder,* '[a] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation . . . if it is based on purely *secular* considerations; to have the protection of the Religion Clauses, the claims must be rooted in *religious* belief.' 406 U.S. at 215, 92 S.Ct. at 1533 (emphasis added)." (*Africa v. Com. of Pa., supra,* 662 F.2d at p. 1034.)

### c. *Wiggins v. Sargent*

The analysis in *Africa* was adopted by the Eighth Circuit Court of Appeals in *Wiggins v. Sargent, supra,* 753 F.2d at page 666. The question before the court of appeals in *Wiggins* was whether the Arkansas Department of Correction violated several inmates' First Amendment rights by prohibiting their receipt of religious literature and correspondence with faith-based leaders. The district court held the inmates' beliefs were not religious in nature. The court of appeals found the district court may have erred in its conclusion to the contrary and remanded the matter for further consideration. (*Id.* at pp. 666-667.) The court of appeals held: "The district court was correct in noting that only sincerely held beliefs which are 'rooted in religion' are protected by the free exercise clause. [Citations.] First amendment religious protection is not extended to 'so-called religions which tend to mock established institutions and are obviously shams and absurdities and whose members are patently devoid of religious sincerity.' [Citation.] . . . [¶] From a review of the limited evidence presented at the hearing, we believe that the district court may have erred in its conclusion that the inmates' beliefs are purely secular. Followers of the churches involved here base their beliefs directly on literal interpretations of fundamentalist Christian theology. They believe that the Bible teaches that race mixing is a sin. However 'unpalatable' such ideas are, it is not a court's prerogative to determine the validity of such beliefs. The belief system here has its own orders of worship and Articles of Faith, not to mention the fact that it has outside-the-prison organization and followers. It has its own religious dogma, hierarchy, and mandated lifestyle. It also appears that the inmates' religion may be comprehensive and that it may address fundamental and ultimate questions. *Cf. Africa v. Commonwealth of Pennsylvania,* [*supra,*] 662 F.2d 1025 . . . ." (*Id.* at p. 666, fn. omitted; see also *U.S. v. DeWitt* (8th Cir. 1996) 95 F.3d 1374, 1375-1376 [the accused's pursuit of out-of-body travel through use of drugs not rooted in religion where not compelled by any belief or conviction other than his own curiosity and the defendant was not concerned about nature of God].)

### d. *Alvarado v. City of San Jose*

The Ninth Circuit Court of Appeals has also adopted the approach discussed in the majority opinion in *Africa*. In *Alvarado v. City of San Jose, supra,* 94 F.3d at page 1225, the Ninth Circuit held a municipality's installation and maintenance of a sculpture did not violate the First Amendment establishment clause or the California Constitution. The court held the sculpture had no religious significance because: "There is no text, creed or

organized group such as the court considered in *Malnak II,* only a sculpture with which plaintiffs have associated a number of unrelated texts and statements of individual response to the work. Under *Africa,* the New Age concepts presented by the plaintiffs, while they invoke 'ultimate concerns,' fail to demonstrate any shared or comprehensive doctrine or to display any of the structural characteristics or formal signs associated with traditional religions. *See* 662 F.2d at 1032-36." (*Alvarado v. City of San Jose, supra,* 94 F.3d at p. 1230.)

### e.    *United States v. Meyers*

The Tenth Circuit analysis closely follows *Africa* and *Alvarado.* In *U.S. v. Meyers, supra,* 95 F.3d at page 1479, the United States Court of Appeals for the Tenth Circuit considered a defendant's claim as follows, "[I]t is his sincere belief that his religion commands him to use, possess, grow and distribute marijuana for the good of mankind and the planet earth." In determining whether the defendant's beliefs were religious, the Tenth Circuit panel considered the following factors paralleling traditional religions: whether fundamental questions about "life, purpose, and death" were addressed; whether a reality transcending the physical world was addressed; whether a particular manner of acting or way of life was prescribed; whether the beliefs were founded or significantly influenced by a deity, teacher, seer, or prophet; whether seminal, elemental, fundamental, or sacred writings were embraced; whether there were clergy, ministers, priests, monks, or other keepers of knowledge; the existence of ceremonies and rituals; whether holidays were observed; whether physical appearance was addressed; and whether there was any mission work or proselytizing. (*Id.* at pp. 1483-1484.) The court of appeals adopted the district court's analysis: " 'Marijuana's medical, therapeutic, and social effects are secular, not religious . . . . Here, the Court cannot give Meyers' 'religious' beliefs much weight because those beliefs appear to be derived entirely from his secular beliefs. In other words, Meyers' secular and religious beliefs overlap only in the sense that Meyers holds secular beliefs which he believes so deeply that he has transformed them into a 'religion.' [¶] While Meyers may sincerely believe that his beliefs are religious, this Court cannot rely on his sincerity to conclude that his beliefs rise to the level of a 'religion' and therefore trigger [the Religious Freedom Restoration Act's] protections. Meyers is, of course, absolutely free to think or believe what he wants. If he thinks that his beliefs are a religion then so be it. No one can restrict his beliefs, and no one should begrudge him those beliefs. None of this, however, changes the fact that his beliefs do not constitute a 'religion' as that term is uneasily defined by law. Were the Court to recognize Meyers' beliefs as religious, it might soon find itself on a

slippery slope where anyone who was cured of an ailment by a 'medicine' that had pleasant side-effects could claim that they had founded a constitutionally or statutorily protected religion based on the beneficial 'medicine.' " (*Id.* at p. 1484.)

### f.   *Spies v. Voinovich*

We have found only one case dealing with veganism and religion. In *Spies v. Voinovich* (6th Cir. 1999) 173 F.3d 398, 407, the court of appeals considered an inmate's claim that as a Zen Buddhist he was required to maintain a vegan diet. The Sixth Circuit disagreed, holding that Zen Buddhism did not require a vegan diet and the vegetarian diet provided sufficed. The court, however, observed, "[I]n pointing out that veganism is not required of Zen Buddhists, we are not stating that Spies's veganism is not a sincerely-held religious belief." (*Ibid.*)

### 6.   *Is Veganism a Religious Creed for Purposes of the FEHA?*

█   As the United States Supreme Court has observed, "The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task . . . ." (*Thomas v. Review Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. at p. 714 [101 S.Ct. at p. 1430]; accord, *Love v. Reed, supra,* 216 F.3d at p. 687.) The test we apply is that set forth in Judge Adams's concurring opinion in *Malnak* which has been adopted by the Third, Eighth, Ninth, and Tenth Circuits. Our review of the authority discussed above leads us to conclude the indicia of religion discussed in Judge Adams's *Malnak* concurring opinion, later adopted by the Third, Ninth, and Tenth Circuit Courts of Appeals in *Africa, Alvarado,* and *Meyers* respectively, presents the best objective method for answering the question whether a belief plays the role of a religion and functions as such in an individual's life. We premise our conclusion on several observations. We summarize them, before fully discussing our analysis. Regulation 7293.1 adopts by its terms a less expansive definition of religion than that promulgated by the EEOC. Other than in the title VII context, the federal courts have in general moved away from the expansive definition of religion in the early conscientious objector cases, *Seeger* and *Welsh,* to a more narrow test—one that compares a belief system to more traditional religions. The indicia of religion discussed in Judge Adams's concurring *Malnak* opinion and adopted by the Third, Eighth, Ninth, and Tenth Circuits presents the best objective test by analogy to mainstream religions for deciding the question before us. Finally, adopting the Third, Eighth, Ninth, and Tenth Circuits' analysis is consistent with regulation 7293.1.

There is a significant difference between the EEOC's administrative construction of the term "religion" and the definition of "religious creed" in regulation 7293.1. Regulation 7293.1 mandates a less expansive construction of "religion." The EEOC definition includes "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." (29 C.F.R. § 1605.1 (2002); see, e.g., *Peterson v. Wilmur Communications, Inc., supra,* 205 F.Supp.2d at p. 1018 ["Purely 'moral and ethical beliefs' can be religious 'so long as they are held with the strength of religious convictions' [Citation.]"]; *Redmond v. GAF Corp., supra,* 574 F.2d at p. 901, fn. 12 [religion exists where a sincerely held belief "is . . . 'religious' in [the] person's own scheme of things"].) Regulation 7293.1, on the other hand, defines "religious creed" as "beliefs, observances, or practices which an individual sincerely holds and which occupy in his or her life *a place of importance parallel to that of traditionally recognized religions."* (Italics added.) Under regulation 7293.1, purely moral or ethical beliefs that are held with the strength of religious convictions may not qualify for protection under the FEHA. Rather, the express language of regulation 7293.1 requires that the belief, observance, or practice occupy a place in the employee's life of "importance parallel to that of traditionally recognized religions." The "importance parallel to that of traditionally recognized religions" requirement is not contained in title 29 Code of Federal Regulations part 1605.1. For example, in *LaViolette v. Daley, supra,* No. 01A01748, the EEOC administratively decided that unconventional beliefs about cold fusion and other technologies were entitled to title VII religion protection. But it is unlikely that beliefs concerning cold fusion would be protected under regulation 7293.1 because they do not have an "importance parallel to that of traditionally recognized religions."

The federal regulation, in our view, goes further than did the United States Supreme Court in *Seeger* and *Welsh.* (See, e.g., *E.E.O.C. v. Union Independiente De La Autoridad, supra,* 279 F.3d at pp. 55-56.) In *Seeger* and *Welsh,* the high court, while adopting an expansive view of "religion," also spoke of and applied the notion that a given belief, to qualify as religious, must occupy a place in the life of its possessor "parallel to that *filled by the orthodox belief in God* of one who clearly qualifies for the exemption." (*United States v. Seeger, supra,* 380 U.S. at p. 166 [85 S.Ct. at p. 854], italics added.) *Seeger* identified the issue before the court as follows, "Our question, therefore, is the narrow one: Does the term 'Supreme Being' as used in [section] 6(j) mean the orthodox God or *the broader concept of a power or being, or a faith, 'to which all else is subordinate or upon which all else is ultimately dependent*[?]' " (*Id.* at p. 174 [85 S.Ct. at p. 858], italics added.) The *Seeger* court concluded that the test of a religion is: "A sincere and

meaningful belief which occupies in the life of its possessor a place parallel *to that filled by God* of those admittedly qualifying for the exemption . . . ." (*Id.* at p. 176 [85 S.Ct. at p. 859], italics added; see also pp. 184-188 [85 S.Ct. at pp. 863-865].) The United States Supreme Court emphasized that religion does not include: "essentially political, sociological, or philosophical views" (*id.* at p. 165 [85 S.Ct. at p. 854]); "essentially political, sociological or economic considerations" (*id.* at p. 173 [85 S.Ct. at p. 858]); or a merely personal code, i.e., a personal belief "in no way related to a Supreme Being." (*Id.* at p. 186 [85 S.Ct. at p. 864].) *Welsh* is to the same effect. (*Welsh v. United States, supra,* 398 U.S. at p. 340 [90 S.Ct. at pp. 1796-1797] [a purely ethical or moral belief that occupies in the individual's life *a place parallel to that filled by God in traditional religions*].) The EEOC regulation, as administratively construed, appears to dispense with the requirement that religion is predicated on something more comprehensive than a personal moral or ethical code, however strongly held. It extends, by its terms, to "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." Under the EEOC definition, as construed administratively, a strongly held moral or ethical view may qualify as a religious belief, even though the view is essentially political, sociological, or economic and is in "no way related to a Supreme Being." (*United States v. Seeger, supra,* 380 U.S. at pp. 165, 173, 186 [85 S.Ct. at pp. 853-854, 857-858, 864].) *Seeger* and *Welsh* are more restrictive than the EEOC's administrative construction of title 29 Code of Federal Regulations part 1605.1 (2002).

Regulation 7293.1, on the other hand, requires something more than a strongly held view of right and wrong. In order to secure FEHA protection, the "beliefs, observances, or practices" must occupy in the person's life *"a place of importance parallel to that of traditionally recognized religions."* (Reg. 7293.1, italics added.) The test is objective. (*United States v. Seeger, supra,* 380 U.S. at p. 184 [85 S.Ct. at p. 863]; accord, *Fellowship of Humanity v. Co. Alameda, supra,* 153 Cal.App.2d at p. 692.) Regulation 7293.1 adopts, by the italicized language, the notion espoused in *Seeger* and *Welsh* that the belief system in question, to qualify as a religion, parallel the belief systems of traditional religions. (*Welsh v. United States, supra,* 398 U.S at pp. 339-340 [90 S.Ct. at pp. 1796-1797]; *United States v. Seeger, supra,* 380 U.S. at pp. 165-166 [85 S.Ct. at pp. 853-854].)

But identifying the differences between the federal guideline as administratively construed and regulation 7293.1 does not answer the question before us. The question remains as to what belief systems typify traditionally recognized religions. That question must be answered because in order for

plaintiff's vegan "beliefs, observances, or practices" to secure FEHA protection, they must have "a place of importance parallel to that of traditionally recognized religions." Complicating the answer to this question is that the expansive definition of religion in the pre-1970 conscientious objector cases, *Seeger* and *Welsh*, has been narrowed somewhat to a more specific test—one that compares a belief system to recognized, traditional religions—as typified by the plurality opinion in *Wisconsin v. Yoder, supra*, 406 U.S. at pages 215-216 [92 S.Ct. at pages 1533-1534]. To further complicate matters, *Seeger* and *Welsh* were statutory interpretation cases, while *Yoder* is a free exercise clause decision. (*Wisconsin v. Yoder, supra*, 406 U.S. at pp. 207, 234-236 [92 S.Ct. at pp. 1529, 1542-1544]; *Welsh v. United States, supra*, 398 U.S. at pp. 335, 343-344 [90 S.Ct. at pp. 1794, 1798-1799]; *United States v. Seeger, supra*, 380 U.S. at p. 174 [85 S.Ct. at p. 858].) Moreover, *Malnak* and its progeny are efforts to define religion in the context of the free exercise clause. (*United States v. Meyers, supra*, 95 F.3d at p. 1484; *Malnak v. Yogi, supra*, 592 F.2d at p. 198.) Finally, many cases which have attempted to define or discuss religious belief have done so in the context of the Religious Freedom Restoration Act, which was invalidated by the United States Supreme Court in *City of Boerne v. Flores* (1997) 521 U.S. 507, 515-530 [117 S.Ct. 2157, 2161-2169, 138 L.Ed.2d 624]. (*U.S. v. Meyers, supra*, 95 F.3d at pp. 1479-1484; *Smith v. Fair Employment & Housing Com., supra*, 12 Cal.4th at pp. 1161-1176.)

We conclude that the best way to assess whether an FEHA claimant's "beliefs, observances, or practices" have "a place of importance parallel to that of traditionally recognized religions," as required by regulation 7293.1, is to utilize the objective analysis enunciated by the Third, Ninth, Eighth, and Tenth Circuits in *Africa, Wiggins, Alvarado, and Meyers*. Flexible application of the objective guidelines identified in those cases will enable courts and administrative agencies to make the sometimes subtle distinction between a religion and a secular belief system. As noted previously, the guidelines are: "First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs." (*Africa v. Com. of Pa., supra*, 662 F.2d at p. 1032, fn. omitted.)

We consider plaintiff's allegations in light of these three indicia. We do not question plaintiff's allegation that his beliefs are sincerely held; it is presumed as a matter of law that they are. However, we disregard conclusory

allegations, for example, that plaintiff's beliefs "occupy a place in [his] life parallel to that filled by God in traditionally religious individuals adhering to the Christian, Jewish or Muslim Faiths." (*Aubry v. Tri-City Hospital Dist., supra,* 2 Cal.4th at pp. 966-967; *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479].) First, plaintiff believes "that all living beings must be valued equally and that it is immoral and unethical for humans to kill and exploit animals even for food, clothing and the testing of product safety for humans"; further, it is "a violation of natural law" to transgress this belief. There is no allegation or judicially noticeable evidence plaintiff's belief system addresses fundamental or ultimate questions. There is no claim that veganism speaks to: the meaning of human existence; the purpose of life; theories of humankind's nature or its place in the universe; matters of human life and death; or the exercise of faith. There is no apparent spiritual or otherworldly component to plaintiff's beliefs. Rather, plaintiff alleges a moral and ethical creed limited to the single subject of highly valuing animal life and ordering one's life based on that perspective. While veganism compels plaintiff to live in accord with strict dictates of behavior, it reflects a moral and secular, rather than religious, philosophy. (*Africa v. Com. of Pa., supra,* 662 F.2d at p. 1033; *Carpenter v. Wilkinson* (N.D. Ohio 1996) 946 F.Supp. 522, 526.) Second, while plaintiff's belief system governs his behavior in wide-ranging respects, including the food he eats, the clothes he wears, and the products he uses, it is not sufficiently comprehensive in nature to fall within the provisions of regulation 7293.1. Plaintiff does not assert that his belief system derives from a power or being or faith to which all else is subordinate or upon which all else depends. (*United States v. Seeger, supra,* 380 U.S. at p. 176 [85 S.Ct. at p. 859]; *Africa v. Com. of Pa., supra,* 662 F.2d at p. 1031.) Third, though not determinative, no formal or external signs of a religion are present. There are no: teachers or leaders; services or ceremonies; structure or organization; orders of worship or articles of faith; or holidays. (*Alvarado v. City of San Jose, supra,* 94 F.3d at p. 1230; *Africa v. Com. of Pa., supra,* 662 F.2d at pp. 1035-1036.)

Absent a broader, more comprehensive scope, extending to ultimate questions, it cannot be said that plaintiff's veganism falls within the scope of regulation 7293.1. Rather, plaintiff's veganism is a personal philosophy, albeit shared by many others, and a way of life. As Associate Justice Werdegar has aptly noted, religious belief is other than "a philosophy or way of life." (*Smith v. Fair Employment & Housing Com., supra,* 12 Cal.4th at p. 1166.) Therefore, plaintiff's veganism is not a religious creed within the meaning of the FEHA. We quite obviously do not resolve the question of

whether a vegan lifestyle that results from a religious belief otherwise meeting the standard in regulation 7293.1 is subject to FEHA coverage.

### 7. *Leave to Amend**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### D., E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III.  DISPOSITION

The judgment is affirmed. Defendants, Southern California Permanente Medical Group, Kaiser Foundation Hospitals, and Kaiser Foundation Health Plan, Inc., are to recover their costs on appeal from plaintiff, Jerold Daniel Friedman.

Grignon, J., and Armstrong, J., concurred.

A petition for a rehearing was denied October 7, 2002, and on September 24, 2002, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 26, 2002. Werdegar, J., and Chin, J., did not participate therein.

*See footnote, *ante*, page 39.